Submitted September 12, reversed December 11, 2019

In the Matter of C. M. C.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

C. M. C.,
*Appellant.*

Multnomah County Circuit Court
18CC04295; A168620

454 P3d 30

Appellant challenges a judgment committing him to the Mental Health Division for a period not to exceed 180 days, arguing that the record is insufficient to support the trial court's determination that his mental disorder rendered him unable to provide for his basic needs, ORS 426.005(1)(f)(B). *Held*: The record was insufficient to support appellant's basic-needs commitment.

Reversed.

L. Randall Weisberg, Judge pro tempore.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Reversed.

## ORTEGA, P. J.

Appellant challenges a judgment committing him to the Mental Health Division for a period not to exceed 180 days on the ground that he has a mental illness. ORS 426.130. Appellant argues that (1) the trial court issued a warrant of detention that lacked proof that he had been advised of the warning required by ORS 426.123(1)—in appellant's view, that constitutes reversible plain error; and (2) the evidence is insufficient to support the trial court's determination that appellant's mental disorder rendered him unable to provide for his basic needs, ORS 426.005(1)(f)(B). We reject appellant's first assignment of error without further discussion. *See State v. C. F. P.*, 299 Or App 196, 447 P3d 85 (2019); *State v. T. H.*, 298 Or App 290, 442 P3d 607 (2019); *State v. R. C.*, 298 Or App 280, 443 P3d 742 (2019). As to the second assignment of error, we agree with appellant that the evidence in the record is insufficient to support his basic-needs commitment. Accordingly, we reverse.

We review whether the state presented sufficient evidence to support appellant's civil commitment for legal error and are bound by the trial court's factual findings that are supported by evidence in the record. *State v. E. D.*, 264 Or App 71, 72, 331 P3d 1032 (2014) (citations omitted). We therefore recite the following facts in the light most favorable to the trial court's disposition. *Id.*

Appellant—who was 22 years old at the time of the commitment hearing—suffers from schizophrenia, and that mental disorder was complicated by his co-occurring developmental disorder of autism. Appellant's conditions caused him extreme anxiety, which led to constant residential instability. In the events leading up to this commitment hearing, for example, appellant was hospitalized at Unity Center for Behavioral Health for a period of three weeks before being discharged and sent to Transition Projects TPI (TPI). Appellant quickly became anxious and left TPI, without taking his medications with him. At 4:00 a.m. the next day, appellant returned to Unity, stating that he did not know how to get food or money and that he had no money, no phone, and only one change of clothing. According to Jennifer Haynes, a case manager with Multnomah County's

Forensic Division Program, this was illustrative of "a cyclical pattern" with appellant: He would be stable when hospitalized; initially would be "completely willing" to try out a housing placement; would quickly change his mind about the placement and leave, often without taking his medications with him; would rapidly decompensate; and would return to the hospital or be picked up by law enforcement.

Appellant's schizophrenia and autism also caused him to exhibit executive-functioning issues with planning, decision-making, and staying focused. Appellant recognized that he had symptoms, but his overall insight into his need for treatment was very poor. Although appellant complied with taking medications, his mother and Tara O'Connor—a psychiatric mental health nurse practitioner at Unity—did not believe that he was organized enough to do so unsupervised: For example, he did not know that he needed to go to a doctor to obtain a prescription as opposed to showing up at a Walgreen's to write his own prescription. O'Connor agreed that medications might not improve some of appellant's cognitive impairments, which had both mental and developmental components, and she explained that multiple antipsychotic medications had yielded negligible improvement. O'Connor described appellant as "thus far be[ing] really treatment resistant"[1] and opined that he might need more aggressive or proactive treatment, which he so far was not willing to consider. In O'Connor's view, appellant was not stable and needed further supervised care and treatment to ensure that he eats, takes medications, and engages in the community appropriately:

> "I think when [appellant] doesn't take his psychiatric medicines, he becomes increasingly emotionally unstable, he has manic symptoms, he does the disrobing, *** he puts himself in harm's way. *** Additionally, [appellant] has a genetic disorder of fat absorption, and also has Hepatitis C, and these two things are causing him to have some scarring of his liver, and elevated liver function tests did indicate that, and he had the thyroid nodule. And so he

___

[1] In context, we understand this portion of O'Connor's statement to mean that appellant's conditions were resistant to treatment—that is, that the treatment had not been as effective in alleviating appellant's conditions as desired—and not that appellant himself was resistant to receiving treatment.

has some medical problems that actually need some additional follow-up. I don't think he could organize himself to follow-up on these problems, and they could become life-threatening if not treated. So I don't think he can *** plan to make meals for himself, I don't think he can figure out *** how to obtain and manage finances to buy food. So he could become malnourished and dehydrated."

Due to appellant's co-occurring mental and developmental conditions, it was also difficult to find housing services that would accommodate him, and living with his mother was not an option. Appellant's five or six past housing placements were unsuccessful because he would "abscond" from the facility, never staying overnight at any of them. On one such occasion, appellant was later located near Emanuel Hospital dressed in only his underwear; he told Haynes that he had been robbed at gunpoint and that he was going to the hospital to get clothes and food. According to Haynes, appropriate housing options for appellant have been exhausted. Haynes perceived no pattern to appellant's reasons for leaving a placement. Haynes also stated that "[n]othing stands out" to suggest that appellant's schizophrenic hallucinations were connected to his reasons for leaving a placement or were interfering with his thinking about caring for himself or accessing food, although she allowed that that "could certainly be part of it." In her year-plus of working with appellant, Haynes explained, she had observed him demonstrate the ability to care for himself only in the sense that he would voluntarily return to the hospital setting to seek out food, shelter, or clothing—but in her view, that was an inappropriate use of hospitalization.

Appellant's mother testified that appellant "absolutely would have difficulty" finding shelter and that he lacked the ability to support himself financially, to find food, and to cover basic survival needs. Appellant "loses things constantly because people take them from him," and he had been assaulted in the past. Appellant's mother was concerned that appellant would befriend somebody on the streets too easily and give away money from his Social Security Disability Insurance benefits (SSDI)—money that had been put on hold because of appellant's hospitalizations and that still needed to be reactivated.

Appellant also testified at the hearing, expressing his wish to be released. Appellant explained that he had left TPI because he did not like that the facility required him to check in multiple times a day and that it provided only shelter and no food. The reason that he had returned to Unity, appellant stated, was because hospital staff had told him that he could do so if he encountered any issues. Appellant had wanted Unity's help contacting his parents and figuring out whether he could go to the Mission, a facility that provided both shelter and food. Appellant explained that he had left his medications at TPI because he had no backpack to carry them around; he had intended to return for them after arranging to go to the Mission. According to appellant, before his continuous encounters with law enforcement and hospitalizations in the last year, he had been living in downtown Portland and getting food at the Mission on his own for a year.

Regarding the incident in which he had been found near Emanuel Hospital, appellant explained that he had left that housing placement because it was a "little, tiny house" "in the middle of absolutely nowhere"; that made him feel uncomfortable and secluded. In response to why he had left a different placement, appellant testified that the facility had requested $600 out of his SSDI, which appellant viewed as too much: "I need to spend it on clothes *** [and] things that are more important than—than the place that I'm living that I don't even want to live at." When asked about his plan if he were released after the hearing, appellant detailed that he would go to the Mission for food and clothing; go reactivate his SSDI; arrange to receive mail at the post office near TPI; and have his parents send him money within two days. With that money, appellant added, he could "stay in a hotel for a little while" or split rent with a friend.

At the end of the hearing, the trial court found clear and convincing evidence that appellant suffers from a mental disorder and that, because of his mental disorder, appellant is unable to provide for his basic personal needs. Describing this as a "difficult and close case[,]" the trial court found that appellant has an awareness of his codiagnoses of autism and schizophrenia, but that he lacks full awareness of his limitations. The trial court also expressed skepticism

regarding appellant's ability to "get his finances together," to "access his meds," and to "survive," stating that appellant "would decompensate rapidly" and "get taken advantage of" due to his impaired decision-making capacity. Sleeping on the sidewalk in August is "fine right now," the trial court opined, but "[i]t's going to be a drag" come September and October. Additionally, the trial court noted that appellant has Hepatitis C and "some other physical problems" that will "be difficult for you to handle the way you are right now[.]" Ultimately, the trial court determined that a basic-needs commitment was "the best course" for appellant, so that his medical providers could "get [appellant] stabilized as best as the medical science is able to do" before he goes back to living "on the streets."

On appeal, appellant does not dispute that he has a mental disorder; he asserts only that the evidence is insufficient to support the trial court's determination that his mental disorder rendered him unable to provide for his basic needs. Specifically, appellant argues that, considering his past ability and future plan to obtain food, medication, and housing, and the absence of evidence establishing a causal connection between his mental disorder and an inability to provide basic needs, the commitment judgment must be reversed.

As relevant here, a person is subject to involuntary civil commitment if the state proves by clear and convincing evidence that the person is a "[p]erson with mental illness" under the current basic-needs provision, ORS 426.005 (1)(f)(B), and neither release nor conditional release is in the person's best interest. ORS 426.130(1)(a)(C). ORS 426.005 (1)(f)(B) provides:

> "(f)   'Person with mental illness' means a person who, because of mental disorder, is one or more of the following:
>
> "* * * * *
>
> "(B)   Unable to provide for basic personal needs that are necessary to avoid *serious physical harm in the near future*, and is not receiving such care as is necessary to avoid such harm."

(Emphasis added.) Recently in *State v. M. A. E.*, 299 Or App 231, 236-37, 448 P3d 656 (2019), we construed ORS

426.005(1)(f)(B) as a matter of first impression and determined that that provision provides for a different legal standard than did the previous basic-needs provision requiring "an imminent threat to safe survival." We specified that the current basic-needs standard differs from its predecessor in two ways: "one that relates to the type of risk the allegedly mentally ill person must face if not involuntarily committed ('serious physical harm') and one that relates to the timeframe in which that risk must exist ('in the near future')." *Id.* at 237. "In sum," we concluded,

> "a person meets the 'basic needs' definition of a '[p]erson with mental illness' under ORS 426.005(1)(f)(B) if the person is unable to provide for his or her basic personal needs in a way that leaves the person at nonspeculative risk of 'serious physical harm'—meaning that the person's safe survival will be compromised—in the near future, even though that risk is not imminent."

*Id.* at 240 (brackets in *M. A. E.*). Additionally, the state must establish "a causal connection" between the person's mental disorder and inability to meet basic needs. *State v. S. S.*, 189 Or App 9, 18, 73 P3d 301 (2003) (citations omitted).

In committing appellant, the trial court primarily cited his inability to obtain medications and to function "on the streets" with his impaired decision-making capacity. Considering that articulation of the trial court's rationale, below and in turn, we discuss the evidence specific to appellant's ability to obtain medical treatment and to his houselessness and then consider other evidence of appellant's general vulnerability to determine whether the trial court permissibly determined that appellant's mental disorder placed him at nonspeculative risk of serious physical harm in the near future. We conclude that, viewing this record as a whole, the evidence is insufficient to support appellant's basic-needs commitment.

Regarding appellant's ability to obtain medications, the record shows that, although he complied with treatment, it provided only slight improvement, and appellant would sometimes leave a housing facility without taking his medications with him. When appellant does not take his medications, he becomes emotionally unstable, has manic

symptoms, and disrobes. The difficulty, however, lies in the absence of any evidence to support the inference that those manifestations of appellant's mental disorder would give rise to a nonspeculative risk of serious physical harm. To contrast, in *M. A. E.*, there was testimony that "providers like soup kitchens would not be willing to serve [the] appellant if she appeared in the psychotic, agitated, and violent state that likely would result if she were released." 299 Or App at 241 (quotation marks omitted). Here, the record might well justify generalized concerns associated with appellant's unmedicated state, but the basic-needs standard requires more particularized evidence of the resulting risk to appellant's "safe survival." *Id.* at 240.

Similarly, the trial court expressed concern about appellant's ability to treat his Hepatitis C and other physical medical problems, but the evidence as to those issues is impermissibly vague and speculative. O'Connor opined that those problems "could become life-threatening if not treated." But, from that testimony alone, the trial court could not reasonably deduce a timeframe in order to determine whether the risk will transpire "in the near future." In *M. A. E.*, there was evidence that the appellant "would decompensate within a matter of days to a week[.]" *Id.* at 241 (quotation marks omitted). Notably, a nonvague estimation of appellant's expected rate of decline or decompensation is lacking from this record.

Turning to appellant's houselessness, the record permits the nonspeculative inference that appellant will experience difficulty locating housing appropriate for his co-occurring disorders of schizophrenia and autism. Moreover, the evidence strongly suggests that appellant would not remain at an unsecured facility for very long; he tends to move about as a result of his anxiety. But even accepting that appellant, by his choice, will likely be without shelter upon release, we have repeatedly stated that houselessness is not a *per se* basis for a basic-needs commitment. *State v. M. A.*, 276 Or App 624, 632, 371 P3d 495 (2016); *see also State v. L. B.*, 138 Or App 94, 99, 906 P2d 849 (1995) ("Although the lack of certain shelter is not a good plan, we cannot say that homelessness by itself is sufficient grounds

for commitment."). Living on the streets "is not necessarily the choice that everyone would make. But it is appellant's choice. And it is not the state's prerogative under the civil commitment statutes to interfere with that choice." *State v. M. G.*, 147 Or App 187, 196, 935 P2d 1224 (1997); *see also State v. T. R. O.*, 208 Or App 686, 692, 145 P3d 350 (2006) ("[C]ivil commitment is not intended to be used as a paternalistic vehicle to save people from themselves." (Citation and quotation marks omitted.)). Certain general risks are inherent to houselessness, but in the absence of more specific evidence, this record is insufficient for the trial court to conclude that the lack of housing would place appellant at nonspeculative risk of serious physical harm in the near future.

The other evidence of limitations and vulnerabilities attendant to appellant's impaired decision-making capacity is similarly insufficient to support a basic-needs commitment. Although appellant's mother testified to her belief that appellant lacks the ability to find food and cover other basic survival needs, that is but "a conclusory assertion that reflects the legal question at issue, rather than evidence of what actually will happen to appellant if he is released." *State v. S. T.*, 294 Or App 683, 687, 432 P3d 378 (2018). For example, the record contains no evidence that appellant is malnourished or would lose weight at a rate that would constitute "serious physical harm in the near future." Nor is there any evidence of appellant's reluctance or refusal to eat. To the contrary, the record shows that appellant will voluntarily seek out a hospital when he needs food. Granted, that may not be an appropriate use of hospitalization, but "appropriate use of hospitalization" is not the applicable legal standard. If anything, appellant's repeated returns to a hospital setting to obtain food, clothing, and shelter demonstrate a level of self-awareness that suggests that civil commitment is inappropriate. *See S. S.*, 189 Or App at 19-20 (reversing based in part on evidence that appellant had some recognition of the need to engage in certain life-sustaining activities).

In committing appellant, the trial court also expressed concern that appellant would be "taken advantage of" on the streets because he befriends people too easily.

But that rationale for commitment would seem to contravene the principle against using commitment procedures as a paternalistic vehicle for saving people from themselves. Here, the record does not reflect that appellant's undiscerning disposition is because of his mental disorder as opposed to, for example, his autism or his natural temperament. Furthermore, although appellant had been assaulted and robbed in the past, any conclusion that similar harms would befall him in the near future because of his mental disorder would be an inferential leap that is inconsistent with the clear-and-convincing evidentiary requirement. *See State v. H. S.*, 194 Or App 587, 595, 95 P3d 1146 (2004) ("'Clear and convincing evidence' is evidence of 'extraordinary persuasiveness,' such that the 'truth of the facts asserted is highly probable[.]'" (Citations omitted.)).

Viewed as a whole, the record establishes that appellant will have certain difficulties navigating through life with his co-occurring mental and developmental challenges, and the trial court's concern for appellant's well-being outside of hospital confines is understandable. But involuntary civil commitment implicates serious liberty interests and social stigmatization and must be supported by clear and convincing evidence. *See, e.g.*, *State v. D. R.*, 239 Or App 576, 582-83, 244 P3d 916 (2010) ("Given the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such a preventive confinement is predicated on a prediction of future behavior, our cases have articulated certain minimum evidentiary standards for commitment."). On this record, the trial court erred in determining that, because of his mental disorder, appellant is unable to provide for his basic needs.

Reversed.