Submitted May 11, affirmed August 26, 2020

In the Matter of N. S.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

N. S.,
*Appellant.*

Klamath County Circuit Court
19CC03338; A171511

472 P3d 818

Appellant appeals from a judgment committing her to the Oregon Health Authority for a period not to exceed 180 days. She argues that the state did not provide sufficient evidence to civilly commit her based on her inability to provide for her basic needs. *Held*: Viewing the facts in the light most favorable to the trial court's disposition, the record contained sufficient evidence that appellant's mental disorder made her unable to provide for her basic needs necessary to avoid serious physical harm in the near future.

Affirmed.

Roxanne B. Osborne, Judge.

Lindsey Burrows and O'Connor Weber LLC filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Beth Andrews, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

## ORTEGA, P. J.

Appellant challenges a judgment committing her to the Oregon Health Authority (OHA) for a period not to exceed 180 days. ORS 426.130. She asserts that the state did not prove by clear and convincing evidence that, because of her mental disorder, she is "unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future[.]" ORS 426.005(1)(f)(B). We affirm.

Appellant does not request that we review her case *de novo*; in any event, this is not an exceptional case justifying such review. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Accordingly, "[w]e review whether the state presented sufficient evidence to support appellant's civil commitment for legal error and are bound by the trial court's factual findings that are supported by evidence in the record." *State v. C. M. C.*, 301 Or App 206, 207, 454 P3d 30 (2019). We describe the facts in accordance with that standard.

Appellant suffers from bipolar disorder and is an ongoing client of Klamath Basin Behavioral Health (KBBH), a mental health clinic. She receives a monthly injection of the antipsychotic medication Invega, an oral version of the antipsychotic medication Haldol, and an antidepressant medication. Appellant is difficult to locate or contact in the community, so she receives her Invega injection when she is in jail, but she often is in jail around the time that her injection is due. Appellant also does not regularly take her oral medications, unless she is in jail or a hospital, because she cannot be located for staff to administer the medication and because she gives her medications away. Appellant has been a client of KBBH since at least 2013 and was committed to assisted outpatient treatment (AOT) in January 2019.

Since January 2019, appellant's primary needs have been housing and medication stabilization. Appellant has failed to complete her outpatient treatment obligations, because she does not believe that she has a mental disorder and frequently fails to pursue treatment. At one point, appellant stated that she did not need to be civilly committed,

claiming that, because she worked at Weyerhaeuser, it had caused her to be blind and deaf, although she is neither, and "she has to talk to herself all the time because she's blind and deaf." Appellant is also "well known" for walking around in "very skimpy clothing or without clothing."

According to Lily Sereno, an employee of KBBH who has been working with appellant since she was committed to outpatient treatment, appellant's "generosity" and "poor boundaries" made it difficult to house and medically stabilize appellant because she gives away her social security money and her medication and lets people stay with her when she has housing. Sereno testified:

"Another reason why we've [had] a hard time housing her is because I think that she's let people into her home in the past. She was in a rental subsidy program where they help pay for your housing and she's gone through that twice now. So that makes her not eligible.

"We've also had difficulty stabilizing her on medications because we can't find her a lot of the times. We've gotten her phones. We've gotten her bus passes.

"We look for her downtown and are not always able to locate her. So we are not able to administer her oral medi[c]ations."

On June 17, 2019, appellant was admitted to Sky Lakes Medical Center on her fourth hospital hold since ordered to AOT, after she was found walking downtown wearing only a t-shirt and exhibiting erratic behaviors. When asked what happened, she responded that someone had put something in her rectum, that it made her defecate herself, and that "it ripped [her] in half." During crisis assessment, appellant was unable to state her name or date of birth and was "muttering and mumbling with nonsensical non-words." When appellant was interviewed the following day, she threatened to kill a security officer and took a swing at a hospital social worker. Appellant was then put on a 14-day diversion at Phoenix Place, a behavioral health center.

On June 22, 2019, the fifth day of applicant's 14-day diversion, she was observed screaming and threatening medical staff and responding to internal stimuli. Appellant

again became verbally aggressive toward staff when they instructed her to return inside after she was observed in the parking lot outside of the facility. Appellant responded that she was already on day 22 of the diversion program and that she would be safe because she was a police officer. Appellant left the facility before the mobile crisis team arrived.

Appellant's whereabouts were unknown for two days before she returned to Sky Lakes on June 24, 2019. At that time, she stated that she had been raped and that things had been inserted into her rectum that she believed were still there. Medical doctors conducted tests and verified that there was nothing inside of her.

Jenny Wheeler, a precommitment investigator, prepared a mental health investigation report and interviewed appellant at the hospital. According to Wheeler, appellant was disoriented to time and place, asserted that the date was "May 3, 1203," and stated that she was not mentally ill. Appellant was unable to form coherent responses when asked about treatment plans and engaging in services. For example, she explained that she did not comply with the 14-day diversion because she was "dead" and that when she sleeps, she dies and goes to her home planet, the moon. When asked about her plans for food if she were to be released, appellant explained that she would get her food from Phoenix Place—but this is not a viable option. When pressed for a plan on how she would obtain food, appellant stated, "I am the Queen, I give it all away because I am an alien queen." Appellant stated that she had not eaten since she was at Phoenix Place, two days prior to her arrival at Sky Lakes. While at Sky Lakes, appellant was "picking" at the food she was offered, and medical staff struggled to get appellant to eat. Although Wheeler did not know what appellant had eaten, she believed that appellant had not eaten a full meal since she left Phoenix Place. Wheeler noted that appellant was out of touch with reality and unable to provide any plan for obtaining food. When asked about her substance abuse, appellant stated that methamphetamine is her medicine.

According to Wheeler, appellant's mental status was consistent with a manic episode. Wheeler opined that appellant would be unable to benefit from an outpatient level

of care because appellant has not been able to engage in her outpatient treatment plan when released from a recent hold: appellant continued to decompensate, engage in "risk taking behavior" leading to increased contact with police, and completely lacks insight into her mental illness.

Sarah Allen, a medical social worker and certified mental health examiner, attempted to meet with appellant twice on the day before the commitment hearing. Appellant was unable to engage with Allen on either occasion because appellant became upset after hearing someone screaming in the emergency room of the hospital and believed it was her child that was being assaulted. Allen had to call security on both occasions.

The following day—the morning of the civil commitment hearing—Allen again visited appellant. There, appellant was responding to internal stimuli—first talking to her daughter who appellant believed was in the room with them, and later talking to her daughter who appellant believed was in her stomach. When asked about her plans for housing, appellant stated that she had "$750 in the bank and that she had made arrangements to buy a new house." Allen opined that, due to appellant's severe mental health issues and extremely poor boundaries, she is at high risk for victimization. Appellant allows people to take her money, and she has reported multiple sexual assaults. Allen also believed that, due to the severity of her mental illness, appellant is unable to keep herself safe or find shelter or food. She also noted that appellant has extremely poor hygiene and that appellant's clothes had been cut so that they barely covered her body.

At the hearing, appellant appeared much thinner than she had the month before and displayed various stages of sunburn. Appellant had not fulfilled any part of her outpatient treatment obligations and was unable to formulate a plan for housing, food, or how she would continue to take her medications to stabilize. Allen testified that appellant is no longer able to eat or stay at the Mission—a facility that provides shelter and food—due to her past behaviors and drug use. Allen opined that appellant had no interest in voluntarily engaging in treatment, because appellant did

not believe that she had a mental health issue. Additionally, Allen testified that appellant was talking to herself "two or three times" in court that day and opined that appellant was "definitely in a manic phase right now."

At the end of the hearing, the trial court found clear and convincing evidence that appellant suffers from a mental disorder and that, because of her mental disorder, appellant is unable to provide for her basic personal needs. The court also expressed concern that appellant was at a great risk of "having someone take advantage of" and hurt her:

> "[The] Court finds that you are mentally ill and that you are unable to provide for your basic needs and that you are at great risk [of] having someone take advantage of you *** and hurt you.
>
> "I'm really worried about you. You can't walk around town without clothes on and hang out with the people that you hang out with, don't have any place to sleep at night that's safe and not oriented to place and time.
>
> "I mean, she doesn't *** know what's going on around her, unable to make decisions for herself. So [the] Court does commit you for 180 days and I hope we can get you back on track because I've seen you much better than this."

On appeal, appellant does not dispute that she has a mental disorder; she asserts only that the evidence is insufficient to support civil commitment. Specifically, appellant argues that the trial court's determination that her mental illness made her unable to care for her basic needs was speculative. We disagree.

A court may involuntarily commit a person with a mental illness to the OHA upon a finding that neither voluntary treatment nor conditional release is in the person's best interest. ORS 426.130(1)(a)(C). A "'person with a mental illness' means a person who, because of a mental disorder, is *** unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f)(B).

In 2015, the legislature changed the "basic needs" definition in two ways, and we explained the new standard

for a basic-needs commitment in *State v. M. A. E.*, 299 Or App 231, 488 P3d 656 (2019). The first change relates to the type of risk the allegedly mentally ill person must face if not involuntarily committed. We explained that "serious physical harm" in this context means "bodily harm that is serious enough that a person who suffers that harm is unsafe in the absence of commitment, treatment, or other amelioration of the physical condition." *Id.* at 239. The second change relates to the timeframe in which the risk of serious physical harm must exist. We concluded that "in the near future" need not be immediate, "so long as the person's mental disorder, and resulting lack of ability to provide for basic needs, puts the person at risk of [serious physical harm] in the near future." *Id.* at 240.

In committing appellant, the trial court primarily cited the risk of harm she faced from others due to her houselessness and disorientation, and also stated that she could not provide for her basic needs, which would include both housing and food. Considering the articulation of the trial court's rationale, we address each of those points in turn, while reiterating that a determination of whether the evidence was sufficient for commitment must be made in light of the *whole* record. *See State v. M. B.*, 300 Or App 522, 529, 452 P3d 1006 (2019) (reversing commitment after considering the evidence both "individually and collectively"); *see, e.g.*, *M. A. E.*, 299 Or App at 241 (affirming judgment of commitment after viewing the record "as a whole"). We conclude that, viewing this record as a whole, the evidence is sufficient to support appellant's basic-needs commitment.

In committing appellant, the trial court expressed concern that she was at a great risk of having someone "take advantage" of her. Appellant argues that it is speculation for the trial court to assume that other persons would harm appellant as a result of her mental health disorder. *See State v. B. B.*, 240 Or App 75, 83, 245 P3d 697 (2010) ("[T]he power to civilly commit a person must not be used as a paternalistic vehicle to save people from themselves." (Internal quotation marks omitted.)). Appellant claimed multiple times over the course of multiple months that she had been raped on the streets. And she came to Sky Lakes, which visit led to this commitment hearing, because she believed she had been

sexually assaulted and may still have objects in her rectum that had been inserted there. The trial court was entitled to credit appellant's testimony that she had been sexually assaulted. Considering the recent, repeated, and severe nature of the sexual assaults that appellant alleged and the other evidence that, due to her mental illness, appellant was wandering the streets disoriented, had extremely poor boundaries, was unable to protect herself, and was wearing little or no clothing, the serious risk of physical harm to appellant in the near future is not speculative. *Cf. C. M. C.*, 301 Or App at 214-15 (a concern that appellant would be "taken advantage of" on the streets contravenes the principle against using the commitment procedures as a paternalistic vehicle in the absence of evidence that appellant's undiscerning disposition was caused by his mental illness).

Turning to appellant's houselessness, it is first important to note that we have repeatedly said that houselessness itself is not grounds for civil commitment. *See, e.g.*, *M. B.*, 300 Or App at 528 ("Although living on the streets may be inherently dangerous, such a generalized risk is not enough to justify involuntary civil commitment."); *see, e.g.*, *C. M. C.*, 301 Or App at 213 ("[H]ouselessness is not a *per se* basis for a basic-needs commitment."). Here, however, appellant's houselessness is coupled with her inability to protect herself from harm, which places her in a nonspeculative risk of serious harm. Appellant could not articulate a viable plan for housing, having stated that she had $750 in the bank and was going to purchase and move into her house on the first of the month. Appellant often gives away her money and is unable to find appropriate housing due to two evictions from a rental subsidy program. In this case, the record demonstrates that appellant is unable to provide for her housing.

In addition to the basic need of shelter, the evidence showed that appellant could not meet her basic need for food, largely based on her disorientation, and that she refused or was unable to comply with taking her medications. Turning first to appellant's medication compliance and stabilization, we note that when an individual cannot function without medications, refusal to take them is evidence of an inability to provide for basic personal needs. *See, e.g.*, *State v. M. C.*,

190 Or App 202, 211-13, 78 P3d 125 (2003) (under pre-2015 standard, which required evidence that the person would not survive in the near future, basic-needs commitment affirmed because appellant's refusal to take medication for her mental disorder rendered appellant unable to articulate any realistic plan to provide for housing and food). Without proper medication, appellant's condition leaves her so "out of touch with reality" that she does not know her own name, believes she is an alien queen whose duty is to give away all of her money and food, and believes that methamphetamine is her medicine. Furthermore, appellant's disorientation prevents her from being able to engage with medical providers and often results in appellant becoming verbally aggressive towards those she perceives as a threat to either her or her internal stimuli that manifests itself as her child. Here, even despite medication compliance at times, appellant continued to decompensate and refused to engage in her outpatient treatment plan, resulting in a complete lack of insight into her mental illness and an inability to keep herself safe.

Appellant's disorientation also prevents her from obtaining and consuming adequate food. Appellant is unable to eat or stay at the Mission—a facility that provides shelter and food—due to her past behaviors and drug use. When asked how she would obtain food, appellant asserted that she would eat at Phoenix Place, a short-term residential facility from which appellant would be unable to obtain food. When pressed for a more definite plan on where and how she would get her food, she continued to state, "I am the Queen, I give it all away because I am an alien queen." One witness testified that appellant appeared much thinner at the commitment hearing, although she was provided food while hospitalized. When hospitalized, staff had to strongly encourage her to eat as she was "picking" at her food. Although we do not express an opinion as to whether such evidence would be sufficient by itself, appellant's risk of suffering serious physical harm in the near future, as explained above, is further supported by her inability or refusal to obtain food. It is common knowledge that a serious risk of harm can result from the inadequate intake of food and, here, appellant had lost weight and was not eating

the food she was offered in the hospital, she did not have a plan to obtain food and expressed a plan to give away any food she did obtain, and she was unable to obtain food at the local shelter. *See, e.g.*, *M. A. E.*, 299 Or App at 242 ("[T]he trial court could infer, as a matter of common knowledge, that a person who literally does not eat will soon be at risk of suffering serious physical harm—of a sort that compromises the person's ability to safely survive—in the near future."). *Cf. M. B.*, 300 Or App at 527 (challenges in obtaining food were not sufficient to support the appellant's commitment where there was no evidence that the appellant did not have access to shelters or soup kitchens or could not obtain a new identification so that she could again obtain food stamps).

Viewing the record as a whole, the evidence is sufficient to support appellant's basic-needs commitment. In this case, there was sufficient evidence to support the trial court's determination that it is highly probable that appellant would be unable to provide for her basic needs—such as obtaining medication, shelter, and food—if left to her own devices, and that that inability subjects her to a risk of serious physical harm in the near future. *See, e.g.*, *M. C.*, 190 Or App at 211-13 (under pre-2015 standard, which required evidence that the person would not survive in the near future, basic-needs commitment affirmed because appellant's refusal to take medication for her mental disorder rendered her unable to articulate any realistic plan to provide for housing and food); *State v. M. J.*, 174 Or App 74, 82-83, 23 P3d 990, *rev den*, 332 Or 316 (2001) (under pre-2015 standard, basic-needs commitment affirmed because a severe mental disorder rendered appellant unable to manage her finances to provide for housing and rendered her unable to eat properly).

In sum, we conclude that the record is sufficient to establish by clear and convincing evidence that appellant was unable to meet her basic personal needs that are necessary to "avoid serious physical harm in the near future[.]" ORS 426.005(1)(f)(B).

Affirmed.