738                  July 10, 2024                  No. 486

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of P. D.,
a Person Alleged to Have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

P. D.,
*Appellant.*

Lane County Circuit Court
23CC01289; A180956

Charles M. Zennaché, Judge.

Argued and submitted March 20, 2024.

Christopher J. O'Connor argued the cause for appellant. Also on the brief was Multnomah Defenders, Inc.

Emily N. Snook, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Appellant appeals from a judgment committing him to the custody of the Oregon Health Authority (OHA) on the basis that he is unable to provide for his basic needs due to a mental disorder. In his first assignment of error, appellant asserts that the state did not prove by clear and convincing evidence that, because of his mental disorder, he is "unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future." ORS 426.005(1)(f)(B). In his second assignment of error, appellant contends that the trial court erred in issuing a firearms prohibition because "the court did not follow the statutory analysis laid out in ORS 426.130(1)(a)(D)." We conclude that the record supports the trial court's basic-needs determination, and that the trial court did not issue a firearms prohibition pursuant to ORS 426.130(1)(a)(D), but rather provided appellant with the notification required under ORS 426.130(4). Thus, we affirm.

"When reviewing a civil commitment, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. E. J. J.*, 308 Or App 603, 604, 479 P3d 1073 (2021) (internal quotation marks omitted). We state the facts consistently with that standard.

Appellant has schizoaffective disorder, bipolar type, which is a mental disorder that causes him to experience delusions, disorganized behavior, and symptoms of mania. In addition to his mental disorder, at the time of the hearing, appellant also was suffering from a variety of physical health concerns including severe lung disease,[1] leg swelling, and cachexia—a condition that causes muscles to waste away. Although appellant had been prescribed medication for both his mental and physical conditions, he was "not completely compliant" with treatment and "require[d] encouragement" to take his medications.

---

[1] Although the record is not entirely clear, it appears that appellant was suffering from both lung cancer and a lung condition for which he had to take antibiotics.

Approximately a month before appellant's civil commitment hearing, appellant became dramatically more symptomatic and displayed high levels of disorganization. That disorganization impacted his ability to maintain a living environment and to manage his food intake. With respect to his living environment, appellant caused two separate floods that resulted in his apartment complex management deeming his apartment "uninhabitable." In the first incident, appellant used the sprayer from his kitchen sink to extinguish a small stove fire that he had caused and, in doing so, he flooded both his kitchen and dining room areas. The second incident occurred a few days later when appellant allowed his bathtub to overflow, causing significant water damage to multiple areas of the apartment. Following these incidents, appellant stayed in a hotel.

During the same month, appellant lost a very significant amount of weight. During that time, appellant was "eating very little food." As a result of appellant's decrease in food intake, appellant lost a total of 28 pounds—about 19 percent of his starting body weight.

For a number of years, appellant received support services from the Laurel Hill Center (LHC), a mental health clinic that assists people who struggle with psychiatric disabilities. His case manager from the center became concerned after observing his increase in symptoms and weight loss and brought him to the emergency room for a mental health evaluation. A doctor placed appellant on a physician's hold. Hicks, a psychiatric mental health nurse practitioner, treated appellant while he was at the hospital leading up to the civil commitment hearing. Hicks explained that, upon appellant's admission to the hospital, she had concerns about malnourishment, and she described appellant as being "underweight." She believed that appellant's low body weight was "related to his not being able to provide himself with food before admission." Hicks stated that appellant was sometimes "delusional about food" and explained that he was "not [eating] regularly" while in the hospital; however, no emergency measures had been taken to feed or hydrate appellant. Although she stated that appellant's nutritional diet had improved since he had been admitted

to the hospital, she described appellant's low body weight as an "immediate medical concern" because he had already "started experiencing consequences \*\*\* from not \*\*\* having enough nutrients. One of them [being] legs edema, legs swelling." Hicks stated that another factor impacting appellant's weight was his cachexia, which Hicks described as a "life-threatening condition," because it meant that appellant was "not getting enough nutrients even to supply [the] metabolic [needs] of his body." According to Hicks, appellant was "not able [to] recognize that he needs psychiatric treatment," and she believed that appellant's mental condition was causing complications with his physical condition.

Williams, the case manager from LHC who had brought appellant to the emergency room, also testified about appellant's recent increase in symptoms. She stated that she had been working with appellant at LHC for over three years and that in the month leading up to appellant's civil commitment hearing, she had observed appellant's "notable" and "significant weight loss." Williams explained that, before his increase in symptoms, appellant was able to shop for and obtain his own food. However, after his increase in symptoms, Williams had to be "more involved" in assisting him with getting food. For example, the last time that Williams took appellant shopping at the grocery store, he spent "about an hour and a half to two hours" at the store but only "selected six cans of soda" to purchase.

After hearing the evidence, the trial court concluded that the state had presented clear and convincing evidence that appellant has a mental disorder (schizoaffective disorder, bipolar type) and that, as a result of his mental disorder, he was unable to provide for his basic needs that are necessary to avoid serious harm in the near future. In coming to that conclusion, the trial court found that, as a result of his mental condition, appellant was experiencing disorganized thinking that rendered him "unable to shop and care for himself." The court noted that the doctor had identified appellant's cachexia as life-threatening and as a likely cause of his leg edema. Thus, the court found that appellant's disorganized thinking was impacting his diet and that appellant's "inability to feed himself \*\*\* would

cause him serious physical harm in the near future. And, frankly, is causing him physical harm right now ***." The court committed appellant to the OHA for a period not to exceed 180 days.

We begin with appellant's first claim of error. On appeal, appellant does not dispute that he has a mental disorder; rather, he argues only that the evidence is insufficient to support the trial court's determination that his mental disorder rendered him unable to provide for his basic needs.

ORS 426.130 provides the framework for the civil commitment of a "person with mental illness." That statutory framework defines a "person with mental illness" to include a person who, because of a mental disorder, is "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f)(B). To satisfy that standard, the state must prove two things: (1) that the individual's inability to provide for their basic personal needs puts them at a "nonspeculative risk of serious physical harm" and (2) that the serious physical harm is likely to occur "in the near future." *State v. M. A. E.*, 299 Or App 231, 240, 448 P3d 656 (2019) (internal quotation marks omitted).

We conclude that the evidence in this record is sufficient as to both requirements. The record contains evidence that appellant's mental disorder caused him to be "delusional about food," leading appellant to experience rapid and significant weight loss that resulted in him being underweight and suffering adverse medical consequences. Appellant's lack of nutrition was already creating adverse medical consequences, such as his leg swelling. The harm that appellant faced was further exacerbated by his cachexia, which was also causing him to lose body weight and muscle mass because he was "not getting enough nutrients even to supply [the] metabolic [needs] of his body." That evidence is collectively sufficient to establish that appellant's inability to manage his food intake placed him at a nonspeculative risk of serious physical harm, specifically life-threatening malnourishment. *See, e.g.*, *State v. N. S.*, 306 Or App 140, 148-49, 472 P3d 818 (2020) (explaining that, among other

evidence, the appellant's inability or refusal to obtain and consume adequate food supported her basic-needs commitment and concluding that "[i]t is common knowledge that a serious risk of harm can result from the inadequate intake of food and, here, appellant had lost weight and was not eating the food she was offered in the hospital"). Although Hicks testified that appellant's nutrition was improving in the hospital and that they had not used any emergency measures to feed or hydrate appellant, given the severity of appellant's malnourishment and related conditions, that slight improvement is not enough for us to conclude that appellant no longer risked serious physical harm.

The evidence was also sufficient for the trial court to conclude that the risk of harm would occur in the "near future." Appellant had already suffered significant and rapid weight loss, irregular food intake, cachexia (which was described as life-threatening), and had an underweight status with resulting physical symptoms. Further, appellant's inability to sustain adequate nutrition due to those interconnected factors—taken together with his lack of insight into his own mental illness—allows for the inference that, without intervention, he would continue to deteriorate physically and, thus, that he was at risk of suffering serious physical harm in the near future. *M. A. E.*, 299 Or App at 239 (defining the phrase "serious physical harm" in the context of ORS 426.005(1)(f)(B) as referring to "bodily harm that is serious enough that a person who suffers that harm is unsafe in the absence of commitment, treatment, or other amelioration of the physical condition").

To the extent appellant argues that the evidence is insufficient because "the record fails to lay out a clear timeline of when [he] was likely to suffer any serious injury," we disagree. As we have previously explained, in assessing whether evidence is sufficient to establish a near-term risk of harm to an appellant, our precedent establishes that the evidence must "establish *how soon* the anticipated harm will likely occur." *State v. R. L. M.*, 309 Or App 545, 551, 482 P3d 201 (2021) (emphasis in original); *accord State v. C. W.*, 333 Or App 400, 406, ___P3d___ (2024) (same). Here, the record, when viewed as a whole, established that appellant

was already experiencing physical harm stemming from his malnourishment. The evidence of appellant's ongoing harm—his recent and rapid significant weight loss, which led to his status of being underweight, and, in particular, the resulting leg swelling and life-threatening cachexia— was sufficient to establish the likelihood of near-term serious physical harm that ORS 426.005(1)(f)(B) requires.

In his second claim of error, appellant contends that the trial court erred when it notified appellant that he was prohibited from purchasing or possessing a firearm. The trial court provided appellant with that notice during the civil commitment hearing and by including a notice provision in the judgment of commitment. At the end of the civil commitment hearing, the court provided appellant with notice of the prohibition when it told appellant that "[y]ou are hereby notified that pursuant to Federal and State law you are prohibited from purchasing or possessing a firearm. You may obtain relief from this prohibition from the Psychiatric [Security] Review Board, pursuant to ORS 166.273, and as provided by Federal Law." The text of the judgment of commitment closely mirrored the court's verbal notice. In appellant's view, the trial court erred in "issuing a firearms prohibition because the court did not follow the statutory analysis laid out in ORS 426.130(1)(a)(D)."

For all of the same reasons that we identified in *C. W.*, appellant's argument is without merit. 333 Or App at 407-08. The notification that the trial court provided to appellant was issued pursuant to ORS 426.130(4). Under that provision, if the court has found that a person suffers from a mental illness and if the court has ordered commitment of that person under ORS 426.130(1)(a)(C), then the court is required to notify that person that they are prohibited from purchasing or possessing a firearm. Because the trial court had made that requisite finding and had ordered civil commitment of appellant, the trial court did not err in providing appellant with the required notification.

Affirmed.