No. 369 April 23, 2025 133

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. T.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

A. T.,
*Appellant.*

Clackamas County Circuit Court
24CC02080; A184247

Thanh H. Tran, Judge.

Submitted March 21, 2025.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Jacquot, Judge, and Kistler, Senior Judge.

JACQUOT, J.

Affirmed.

**JACQUOT, J.**

Appellant seeks reversal of a judgment committing him to the custody of the Oregon Health Authority (OHA) on the basis that he was unable to provide for his basic needs due to a mental disorder. In a single assignment of error, appellant asserts that the court erred in committing him because the state did not prove by clear and convincing evidence that, because of his mental disorder, he was "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and [was] not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f)(B). We conclude that the record supports the trial court's basic needs determination, and we affirm.

Appellant does not dispute that he has a mental disorder;[1] rather, he argues that the evidence is insufficient to support the trial court's determination that his mental disorder rendered him unable to provide for his basic needs.[2] Appellant argues that the evidence was insufficient to show that he was at risk of serious physical harm in the near future.[3]

Neither party has requested *de novo* review or identified circumstances that would make such review appropriate; thus, "[w]e review whether the state presented sufficient evidence to support appellant's civil commitment for legal error and are bound by the trial court's factual findings that are supported by evidence in the record." *State v. C. M. C.*, 301 Or App 206, 207, 454 P3d 30 (2019). "[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial

---

[1] Appellant was diagnosed with Bipolar Disorder I with Psychotic Features. Appellant also has a longstanding diagnosis of Autism Spectrum Disorder. Appellant also does not appear to challenge the trial court's finding that his mental disorder caused him to refuse to eat or drink.

[2] The state argued that appellant should be committed based upon both an inability to provide for basic needs and a danger to others theory. The trial court determined that appellant did not meet the criteria to be committed as a danger to others.

[3] The trial court also discussed appellant's risk of future houselessness because his mother testified that he could not return to live with her if he refused to take medication. Because the trial court did not err in committing appellant based on his refusal to eat or drink, we do not discuss appellant's risk of houselessness.

court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. E. J. J.*, 308 Or App 603, 604, 479 P3d 1073 (2021).

To commit a "person with mental illness" on the basis of "basic needs," the state must prove that, because of a mental disorder, the person is "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f)(B). To satisfy that standard and commit a person based upon inability to provide for basic personal needs, such as food, water, and necessary medical care, "the state must prove two things: (1) that the individual's inability to provide for their basic personal needs puts them at a nonspeculative risk of serious physical harm and (2) that the serious physical harm is likely to occur in the near future." *State v. P. D.*, 333 Or App 738, 742, 553 P3d 1063 (2024).

Regarding the nonspeculative risk of serious physical harm, it is well-established that the refusal to eat or drink creates a risk of serious physical harm. *See, e.g.*, *State v. M. A. E.*, 299 Or App 231, 242, 448 P3d 656 (2019) (affirming commitment and explaining that it is "a matter of common knowledge, that a person who literally does not eat will soon be at risk of suffering serious physical harm"). Here, the record contains evidence that, while unmedicated, appellant's mental disorder caused him to believe his food and water were poisoned, and that he had not been "eating, drinking, or showering in a number of days." He would throw out groceries that his mother brought home, believing they were poisoned. When he presented to the hospital, appellant's potassium level was "very low," and he had lost 20 to 30 pounds over an unspecified period of time. Once admitted, appellant eventually began eating and drinking small amounts, but only with coaxing and extensive involvement of hospital staff. *See State v. N. S.*, 306 Or App 140, 148-49, 472 P3d 818 (2020) (explaining that, among other evidence, the appellant's inability or refusal to obtain and consume adequate food supported her basic needs commitment and that "[i]t is common knowledge that a serious risk of harm can result from the inadequate intake of food and,

here, appellant had lost weight and was not eating the food she was offered in the hospital"). He continued to refuse all medication and denied that he has mental illness.

Regarding whether the serious physical harm is "likely to occur in the near future," appellant argues that there is insufficient evidence that he will suffer harm in the near term, "as opposed to occurring at some speculative time in the future." Our precedent establishes that, in assessing whether evidence is sufficient to establish a near-term risk of harm to an appellant, the evidence must "establish *how soon* the anticipated harm will likely occur." *State v. R. L. M.*, 309 Or App 545, 551, 482 P3d 201 (2021) (emphasis in original); *accord State v. C. W.*, 333 Or App 400, 406, 553 P3d 577 (2024) (same); *P. D.*, 333 Or App at 743-44 (same). However, a basic needs commitment due to failure to eat food or drink water can be appropriate without evidence of immediate risk of harm because of the reasonable inference that a person who stops eating food will soon die. *M. A. E.*, 299 Or App at 242 ("Although no witness testified as to the harm associated with an absence of food, the trial court could infer, as a matter of common knowledge, that a person who literally does not eat will soon be at risk of suffering serious physical harm—of a sort that compromises the person's ability to safely survive—in the near future.").

This is a close case, but "the record, when viewed as a whole, established that appellant was already experiencing physical harm stemming from his malnourishment," and the court could infer that "without intervention, [appellant] would continue to deteriorate physically and, thus, that he was at risk of suffering serious physical harm in the near future." *P. D.*, 333 Or App at 743-44. Although the record shows that appellant's BMI was within the healthy range, he had lost 20 to 30 pounds before his hospital admission, and his malnutrition had caused a potassium deficiency. A doctor testified that, upon hospital admission, appellant's potassium level was "very low" and "concerning," and that low potassium can be "pretty dangerous" and lead to "cardiac events" and seizures. She estimated that appellant's potassium level suggested that appellant had not been sufficiently eating or drinking for at least seven to 10 days. The

doctor further testified that she thought that if a person did not raise their potassium levels, they would experience such adverse effects within a few days.

By the time of the hearing, appellant's potassium level was back to normal. However, the record indicates that he was eating only "10 to 20 percent" of the meals provided to him. Appellant was only consuming food and drink when coaxed by hospital staff—in particular, one nurse that he liked—who were "constantly finding that moment that he would eat" a few bites or take a sip of water. He maintained paranoia about poison in his food and water and refused all medication in the hospital. It was reasonable for the court to infer that, if released, appellant's paranoia would continue, he would not begin taking medication, and without the structure provided in the hospital and the constant staff intervention, his malnutrition would worsen.

Viewed as a whole, the evidence of appellant's harm from his paranoia regarding his food and water being poisoned—particularly his low potassium level—along with his lack of insight into his condition, minimal and inconsistent eating and drinking even while hospitalized, lack of motivation to eat and drink without constant intervention, and refusal to take medication or engage in treatment to alleviate the paranoia, was sufficient to establish the likelihood of near-term serious physical harm that ORS 426.005(1)(f)(B) requires. Accordingly, the record supports the trial court's basic needs determination.

Affirmed.