Submitted November 29, 2018, reversed October 9, 2019

In the Matter of L. M.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

L. M.,
*Appellant.*

Lane County Circuit Court
17CC04823; A166994

450 P3d 548

Appellant in this civil commitment case appeals an order continuing his commitment to the Oregon Health Authority for an additional period not to exceed 180 days. On appeal, appellant asserts that the trial court erred in determining that he was unable to provide for his basic needs because he had a history of resisting medical treatment. *Held*: The record was insufficient to support a finding that appellant's mental disorder left him unable to provide for his basic needs.

Reversed.

Janet A. Klapstein, Judge pro tempore.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Robert M. Wilsey, Assistant Attorney General, filed the brief for respondent.

Before Hadlock, Presiding Judge, and DeHoog, Judge, and Aoyagi, Judge.

HADLOCK, P. J.

Reversed.

**HADLOCK, P. J.**

Appellant was committed to the Oregon Health Authority because of mental illness in 2017 and, in the proceeding that is the subject of this appeal, was committed in early 2018 for an additional period of up to 180 days. The trial court based that commitment exclusively on the basis that appellant continued to be mentally ill because his mental disorder left him unable to provide for his basic needs. On appeal from the order of continued commitment, appellant argues that the record does not support the trial court's basic-needs determination. We agree and, accordingly, reverse.

We describe the facts in the light most favorable to the trial court's order. *State v. M. G.*, 296 Or App 714, 715, 440 P3d 123 (2019). At the time of the January 2018 continued-commitment hearing, appellant was housed at the Oregon State Hospital. He was 21 years old and would turn 22 in March. Appellant's treating psychiatrist testified that information from appellant's family indicated that appellant had "probably been psychotic and ill since the age of 18."[1] Before his initial commitment in 2017, appellant lived with his family. He often wandered away from home, sometimes returning only partly dressed. At least once, his family members found him lying on a sidewalk near busy streets. He drank "household cleaner, such as Pine-Sol," and had other disorganized behaviors. Appellant's family members attempted "numerous times" to get him help, including by taking him to appointments, the nature of which is not described in the record. Appellant once jumped from a moving car to avoid going to an appointment. He also jumped from second-floor balconies and ran to avoid appointments. In the past, appellant has become "very psychotic" when not medicated, has had "multiple run-ins with the law," and has pushed family

---

[1] The only evidence in the record is the psychiatrist's testimony. The transcript suggests that the trial court admitted some unspecified portion of that evidence only for the limited purposes of providing "background" information and as the basis for the psychiatrist's opinion. On appeal, the parties have not engaged on the question of whether that ruling limited the portions of the psychiatrist's testimony that the trial court could properly consider in determining whether appellant continued to be mentally ill. We need not address that question because, even considering all of the events and circumstances that the psychiatrist described, we conclude that her testimony was insufficient to support the trial court's continued-commitment order.

members and destroyed property. Appellant was unkempt and, in the six months before his initial hospitalization, he lost 30 pounds. However, the record does not reflect whether that weight loss created any medical concerns.

In the summer of 2017, appellant "sustained a laceration to his hand and to his arm," and his family found him "with pools of blood." Appellant would not go with his family to the hospital, so they called 9-1-1 and had him taken in for treatment, which included staples. When it was time for the staples to be removed, it took three family members to get him to the hospital to have that done. While there, family members were able to have appellant psychiatrically admitted, and he was hospitalized for about two weeks. Appellant was given medications and sent home, but he disappeared two days later. Appellant returned home within a few days, "but he was only wearing paper bottom scrubs" and "had EKG stickers all over his chest and he had an IV-line in his arm." Appellant's initial commitment followed.

While hospitalized on that commitment order, appellant needed round-the-clock supervision for such things as administration of medications and attending to his hygiene and grooming, despite being on a medication regime. He needed constant reminders to change clothing and do laundry and was oblivious when he spilled liquids on himself. He often threw out the food he was given and then rummaged through trash for scraps. However, although appellant has some nonpsychiatric medical conditions, none of them pose a risk to his personal safety or his life, and he is "very healthy."

Appellant's psychiatrist does not believe that appellant will continue taking medications if he is released into an unsupervised setting. Without medications, appellant would "decompensate further" and his symptoms "would become much worse." In the psychiatrist's view, appellant would not be able to "take care of his basic needs" and "could possibly become physically aggressive." The psychiatrist does not believe that appellant is ready to leave the hospital. Appellant's family is "incredibly supportive," but he can no longer live with his mother because, when he did, "there was a lot of property destruction at the apartment," and she was evicted.

The trial court announced its ruling at the end of the hearing, explaining the specific reasons that it found appellant unable to provide for his basic needs. First, the court noted that it was not basing its ruling on the evidence regarding appellant's eating and hygiene behaviors. Rather, the court's ruling was essentially based on appellant's history of being "actively resistant to seeking medical attention":

> "So were he to be harmed, hit by a car, injured, he not only would not know how to seek medical attention, but would be actively resistant to medical attention, and I agree that he has a history of refusing hospitalization on a number of occasion[s], even to the extent that he's jumping off balconies, out of moving cars. I think the legal issue were this to be appealed is really the issue of imminency.

> "I think that's a tough call, but on this kind of history, given the extreme measures he has gone to, to avoid treatment for physical injury, I'm going to find that he remains unable to care for his basic personal needs and not really the hygiene, but [unable] to find medical assistance and be receptive to medical assistance for personal injuries when he is active in his schizophrenia condition."

Appellant challenges that order on appeal, arguing, among other things, that "the court's concern that appellant would fail to obtain medical treatment" for "some sort of accident in the future is speculative." In response, the state asserts that the evidence related to appellant's efforts to avoid necessary medical treatment was sufficient to support the court's "determination that appellant, because of his mental disorder, is unable to provide for his basic personal needs necessary to avoid serious physical harm in the future."

In a continued-commitment proceeding of the kind involved here, the trial court's task is to "determine whether the person is still a person with mental illness and is in need of further treatment." ORS 426.307(6); *see also M. G.*, 296 Or App at 717 (explaining continued-commitment process). A "person with mental illness" is defined to include a person who, because of a mental disorder, is "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such

care as is necessary to avoid such harm." ORS 426.005(1)(f). We recently explained that the term "serious physical harm," as used in that statute, "means bodily harm that is serious enough that a person who suffers that harm is unsafe in the absence of commitment, treatment, or other amelioration of the physical condition." *State v. M. A. E.*, 299 Or App 231, 239, 448 P3d 656 (2019). We also explained that the risk of serious physical harm need not be "imminent" or "immediate"; all the statute requires is that the person be unable to provide for basic needs that are necessary to avoid such harm "in the near future." *Id*. at 240 (quoting ORS 426.005(1)(f)).

Here, we understand appellant to argue that, even though there is evidence that he has avoided medical treatment for physical injuries in the past, the record does not include evidence either that appellant had any analogous injury or condition at the time of the continued-commitment hearing or that he was at risk of an injury-causing accident in the near future for which medical care would be necessary. We agree. The trial court certainly could infer from this record that appellant would not take medications if released from the hospital and that, *if* he suffered a physical injury while not receiving treatment for his mental disorder, he would resist being treated for that injury. The difficulty, however, is that the record includes no basis on which the court could infer that appellant would sustain any type of physical injury in the near future; nor does it include evidence that would support a finding that, if appellant were injured, the injury itself would constitute "serious physical harm" or would lead to such harm if untreated.

As to timing, although the record includes evidence of several alarming incidents before appellant was hospitalized in 2017, including the hand/arm laceration, drinking household cleaner, and jumping from one or more balconies, the evidence about those incidents is so lacking in detail that it cannot form the basis for predicting what will happen "in the near future." Three years passed between when appellant's psychosis first manifested and when he was hospitalized. The hand/arm laceration occurred shortly before appellant was hospitalized, but no evidence suggests when,

during that three-year period, the other alarming incidents occurred. Nor does any evidence indicate whether those were isolated incidents or occurred with some frequency. In particular, nothing in the record would support an inference that the hand/arm-laceration incident was other than a one-time event. In the absence of such evidence, only speculation could lead to a determination that another such incident would occur in the "near future" if appellant were released.

The record is similarly lacking when it comes to the risk of appellant suffering any injury, much less "serious physical harm," in the future. Except in relation to whatever caused the laceration of appellant's hand and arm, no evidence suggests that any of appellant's other conduct led to an injury or even caused a *risk* of serious physical harm (the record does not indicate, for example, whether appellant repeatedly gulped household cleaner or once took a sip). Nor does any evidence suggest that appellant's laceration injury was the result of intentional self-harm. The record also does not include any evidence suggesting that appellant suffered serious physical harm on the occasions when he successfully avoided medical treatment that family members attempted to obtain for him. Moreover, except in relation to the hand/arm laceration, no evidence supports an inference that appellant *would have* suffered serious physical harm on the occasions when he tried to avoid treatment, but failed. Finally, the evidence about appellant's past aggression includes no information suggesting that his aggressive conduct ever led to appellant being at risk of being harmed himself or that any similar conduct was likely to put appellant at risk in the future.

In sum, although the record supports the trial court's inference that appellant's mental disorder makes him likely to resist medical treatment for any injuries he may suffer in the future, the record is not adequate to support a finding that appellant is likely to sustain an injury in the near future that, if untreated, will lead to serious physical harm.[2] Accordingly, the trial court erred when it continued

---

[2] Because we reverse appellant's continued commitment on the merits, we need not address appellant's additional (and unpreserved) argument concerning

appellant's commitment on the ground that his mental disorder made him unable to care for his basic needs.

Reversed.

---

the adequacy of the information that the trial court gave him at the start of the continued-commitment hearing.