Submitted April 21, reversed June 17, 2020

In the Matter of M. C. D.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

M. C. D.,
*Appellant.*

Marion County Circuit Court
18CC05106; A171209

467 P3d 84

Appellant in this civil commitment case appeals an order continuing her commitment to the Oregon Health Authority for an additional period not to exceed 180 days. On appeal, appellant asserts that the trial court erred in determining that she was unable to provide for her basic needs. *Held*: The record lacks sufficient evidence to support the trial court's determination that appellant was unable to provide for her basic needs.

Reversed.

Manuel Perez, Judge pro tempore.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General, filed the brief for respondent.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Reversed.

**MOONEY, J.**

Appellant seeks reversal of an order continuing her commitment to the custody of the Oregon Health Authority for a period not to exceed 180 days, which is based on a determination by the trial court that appellant is unable to provide for her basic needs. ORS 426.005(1)(f)(B). In her sole assignment of error, appellant contends that the record does not contain legally sufficient evidence that she continues to be a person with mental illness and that she is in need of further treatment. As we explain below, we agree with appellant. Accordingly, we reverse.

We "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. A.*, 276 Or App 624, 625, 371 P3d 495 (2016) (internal quotation marks omitted). We describe the facts in accordance with that standard.

Appellant was admitted to the Oregon State Hospital in October 2018 after being civilly committed. The trial court held a hearing in May 2019 to consider whether appellant's commitment should be continued. *See* ORS 426.307(6) (if person with mental illness requests hearing, "court shall * * * conduct a hearing and * * * shall determine whether the person is still a person with mental illness and is in need of further treatment"). The state called two witnesses to testify at the hearing; appellant did not testify. Neither party offered any exhibits.

The first witness who testified was Dr. Shad, who had been appellant's treating psychiatrist at the hospital for approximately four months. Shad explained that appellant has a diagnosis of schizophrenia. Appellant also has a diagnosis of post-traumatic stress disorder (PTSD) and a historical diagnosis of catatonia, but Shad had not seen any symptoms of catatonia while appellant had been in the state hospital. Shad testified that appellant does not have any insight into her mental illness: She claims not to have any psychiatric problem, says that she does not need medication, and states that medication makes her feel "toxic and even

sicker." She refuses to take oral medication and, for that reason, four or five months ago, the hospital started her on a long-acting injectable medication, Aristada, to treat psychosis. The dosage of medication she is on can be administered every four weeks or every six weeks, and a form of the drug that can be given via injection once every two months has recently become available. Shad expressed his opinion that giving appellant an injection every other month—or six times a year—might be desirable in her situation because it would require fewer clinic visits and because she refuses all oral medications. Shad explained that, since appellant has been taking the injectable medication, she has shown improvement in her behavior. She is not aggressive, minds her own business in the unit, and has not had problems interacting with her peers and staff.[1] In addition, a few months before the hearing, she was not taking care of her personal hygiene, including not showering for days, and she was trying to collect her urine and feces so that she could see "if drugs are toxic or not." Those behaviors have stopped. However, appellant has a delusion—a symptom of her schizophrenia—that has continued, which is that she believes that accepting Social Security benefits in the past is what made her sick. Shad testified that that delusion is so strong that appellant refuses to accept any benefits whatsoever.

Appellant does not have a history of not eating or drinking appropriately and she does not have any major medical issues; Shad did not express concern regarding those areas of appellant's life. Shad testified that appellant "seems to have depression" and has some obsessive-compulsive features; for example, she gathers items like papers, flowers, and leaves of trees.[2] The signs of depression—such as lack of expression, isolation, and being less interactive—began to show up in the weeks before the hearing. Shad does not know if it is depression or a depressive phase of appellant's diagnosed illness. Shad would like to treat those symptoms

---

[1] Shad did not provide details about what her behavior was like before it improved.

[2] As noted, appellant had ceased attempting to collect her urine and feces. Shad explained that collecting urine and feces "is dangerous for hygiene and can result in infections and medical problems."

with another set of medications called Selective Serotonin Reuptake Inhibitors (SSRIs), but every time he asks appellant for permission to give her such medication, she refuses. According to Shad, SSRIs would also help to treat her PTSD.

Shad expressed concerns with appellant transitioning back to the community and explained that she has refused to go for any screenings that would facilitate her entering a lower level of care or a local residential facility; 11 screenings had been arranged for her within the past 60 days. Appellant has stated that she just wants "to be free." Appellant is also refusing to accept benefits, which means that, if released from care at the hospital, she would be going to the outside world homeless and with no money to buy food and sustain herself. When Shad discusses those concerns with appellant, she responds without further explanation, "I'll manage." Shad stated that he "just [does not] feel comfortable in letting her go outside in the world without any support[,] considering her *** psychiatric illness." Appellant has a mother and brother, but she has alienated both of them and they are not a resource for her to rely on.

When asked whether it was his opinion that appellant would be unable to provide for her basic needs if she were to be released without any further assistance from the hospital, Shad stated:

> "I believe so just because of that one reason that she would not have any means to buy anything. And so the activity of daily living like even cooking, you know, and taking showers and I'm really concerned where she's going to go and achieve all those things. So I think this to me is really a dangerous situation."

According to Shad, because appellant is on an injectable, longer-lasting form of medication, it could be three to five months before she would start to decompensate, relapse, and experience psychosis if she were released and no longer took the medication. But whether appellant takes antipsychotic medication is not the only issue for Shad—his "bigger concern" is how "she is going to survive out there without any benefits, without any place to go and live." It is Shad's professional opinion that appellant will not be able to get a job because of her behaviors, her depression, and the fact that

she will not have a place to live and her hygiene will become questionable because of her lack of facilities and resources.

When asked about appellant's need for further treatment, Shad explained that he "wish[ed] she could agree to some more medications" and "if given a chance[, he] would really like to optimize her treatment." He would like to see an improvement in her depression, because psychosis can sometimes worsen if other psychiatric symptoms are not treated. However, Shad acknowledged that there was "nothing [they] could do" because of appellant's refusal to take oral medications or cooperate with screenings for a residential living situation, and the likely next step would be to appoint a guardian for her.

The state's second witness was Spencer, who is a clinical social worker at the state hospital. She meets with patients, works on discharge planning, and does assessments and family therapy. She also makes sure patients have benefits and she works with the benefit coordinator. Spencer is appellant's social worker and has been working with her to try to transition her out of the hospital to another placement. Spencer has helped obtain referrals to optional placements for appellant to consider, such as group homes and adult foster homes. As noted previously, appellant refused to interview with any of those potential placements. Appellant has told Spencer that she does not want to live in any kind of home; she wants to be out in the community and "just wants to be free."

Spencer has asked appellant a number of times specifically what her plans are for how she will survive if released from the hospital: "What will you eat, where will you sleep[?]" Appellant just says that she will be okay, but does not express any plans. Spencer also testified that appellant's family is not a housing resource for her, in part because there is a no-contact order in place that prohibits appellant from having contact with her mother. Spencer is concerned, like Shad, about the fact that appellant does not want to accept benefits. Appellant told Spencer that she wants to go back to work. Approximately five years ago she had been working in the cosmetology field and was self-sufficient in the community; however, she "evidently *** decided not to

take her medication, which precipitated decompensation," and then was hospitalized.

In response to a question by the trial court regarding why hospital staff think that appellant needs to go to a group home or other facility rather than directly into the community, Spencer stated:

"My clinical assessment is that [appellant] is at extreme risk of victimization. She has no plan for being able to provide for even her basic needs. She right now isn't able to infer what the negative outcomes to not being able to have money for food or even any idea of where she will go or what she will do is what concerns me.

"I recognize that people are often in the community homeless. But they're able to plan for that. And her reluctance to accept any benefits is going to leave her without any funds whatsoever."

After the two witnesses testified, each side presented a brief closing argument before the court announced its decision. The state relied on appellant's "lack of insight into her mental illness and the complete unpreparedness that [she had] to be released into the community" as a basis for its contention that she was unable to provide for her basic needs. For her part, appellant argued that she was eating and appropriately taking care of her personal hygiene, that homelessness itself was not a criterion for commitment, and that she should be released from the hospital. The court stated that it was "concerned about several things that the doctor said[, and] that [appellant's] mental illness causes [her] to have a lack of insight as to [her] needs and the ability to care for [herself] and to access resources that are available for [her]." The court found that appellant continued to suffer from a mental illness that caused her to not be able to meet her basic needs, and continued her commitment for an additional 180 days. This appeal followed.

If the trial court determines by clear and convincing evidence that a "person is still a person with mental illness and is in need of further treatment," the court may continue the person's involuntary commitment. ORS 426.307(6). Whether the evidence is legally sufficient to support the court's determination and continued commitment

is a question of law. *State v. M. B.*, 300 Or App 522, 526, 452 P3d 1006 (2019). As pertinent to this appeal, a "[p]erson with mental illness" is defined as "a person who, because of a mental disorder, is * * * [u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f). We recently concluded that

> "a person meets the 'basic needs' definition of a '[p]erson with mental illness' under ORS 426.005(1)(f)(B) if the person is unable to provide for his or her basic personal needs in a way that leaves the person at nonspeculative risk of 'serious physical harm'—meaning that the person's safe survival will be compromised—in the near future, even though that risk is not imminent."

*State v. M. A. E.*, 299 Or App 231, 240, 448 P3d 656 (2019). We also explained that "the risk of serious physical harm need not be *immediate* to justify involuntary commitment, so long as the person's mental disorder, and resulting lack of ability to provide for basic needs, puts the person at risk of such harm in the near future." *Id.* (emphasis in original).

On appeal, appellant does not dispute that she has a mental disorder; she contends only that there was insufficient evidence to support the trial court's determination that, as a result of her mental disorder, she cannot provide for her basic needs. She asserts that any risk of serious physical harm to herself was speculative in nature and not borne out by the evidence in the record. In defense of the commitment, the state argues that the record shows that appellant lacked the resources to obtain food and shelter on her own; refused to accept medical, financial, and housing assistance because of a delusional belief about accepting social security benefits in the past; and was unlikely to seek out or continue any mental health care.

In articulating its basis for continuing appellant's commitment, the trial court focused on appellant's "lack of insight as to [her] needs and the ability to care for [herself] and to access resources that are available for [her]." Although the record contains evidence that appellant did not articulate a plan for obtaining housing and food upon

her release from the hospital and that she would not have a source of income from Social Security benefits, the record lacks evidence to support a determination that there is a nonspeculative risk to appellant of serious physical harm in the near future. Thus, we conclude that, viewing the record as a whole, the evidence is insufficient to support appellant's basic-needs commitment.

In regard to appellant's housing situation, there is evidence to support a nonspeculative inference that appellant would be homeless upon her release from the hospital. Shad and Spencer testified that appellant refused to interview with potential transitional housing placements, and, in addition, appellant had not articulated any housing plan to hospital staff, indicating instead that she just wanted to be free. However, "even accepting that appellant, by [her] choice, will likely be without shelter upon release, we have repeatedly stated that [home]lessness is not a *per se* basis for a basic-needs commitment." *State v. C. M. C.*, 301 Or App 206, 213, 454 P3d 30 (2019) (applying the current version of ORS 425.005(1)(f)(B) and citing *M. A.*, 276 Or App at 632, and *State v. L. B.*, 138 Or App 94, 99, 906 P2d 849 (1995)). Although there are potential risks involved in living on the streets, "a generalized risk is not enough to justify involuntary civil commitment." *M. B.*, 300 Or App at 528. Here, there is no evidence in the record to support a finding that there is a specific risk of serious physical harm for appellant—that her safe survival will be compromised—due to her lack of a housing plan.

With respect to evidence regarding appellant's ability to access food and water, Shad testified that there had not been any problems with appellant eating and drinking. There was no evidence of appellant being unwilling to eat or drink, any problems with appellant's weight, or other health-related concerns regarding her food and water intake. The concern expressed by the witnesses was focused on appellant's lack of financial resources to purchase food; however, generalized concerns are not sufficient. Neither witness articulated a specific harm or time frame in which harm would befall appellant due to her lack of ability to purchase food. We have previously held that evidence that a

person with a mental disorder would not be able to "fix a proper meal" or obtain healthy food was insufficient to support a basic-needs commitment. *State v. S. T.*, 294 Or App 683, 685-87, 432 P3d 378 (2018); *cf. M. A. E.*, 299 Or App at 241-42 (basic-needs commitment supported by evidence that, within a week from her release, the appellant would be unable to obtain food even if she wanted to eat). Here, there was no evidence that appellant would be unable to access food *at all*; rather, the witnesses expressed their concern that, due to lack of money, she would not be able to purchase it.

It is clear that both witnesses who testified in support of continuing appellant's commitment were concerned about her well-being if she were released. Shad expressed his opinion that appellant would be unable to provide for her basic needs, and he stated concern about how "she is going to survive out there without any benefits, without any place to go and live." However, his statements in that regard were conclusory and merely reflected the legal question at issue. *See S. T.*, 294 Or App at 686-87 (commitment reversed when physician's testimony about the appellant's inability to survive was conclusory statement without additional evidence to support or explain it). Shad did not describe what specifically he thought would happen to appellant if she were to be released, and he did not explain what he meant when he expressed concern about how she would survive. In addition, although there is evidence in the record that would support an inference that appellant would not continue to take medication upon her release, Shad testified that it would be three to five months before appellant would decompensate, and he did not explain what he expected the ramifications of that future decompensation to be. Similarly, Spencer stated that appellant would be "at extreme risk of victimization" but did not explain what she meant by that generalized statement, which is not sufficient by itself to establish a nonspeculative risk of serious physical harm.

Viewed as a whole, the evidence in this record is legally insufficient to support the trial court's determination that appellant is unable to provide for her basic needs; it does not establish how appellant's lack of plans to obtain

shelter and food leaves her at nonspeculative risk of "serious physical harm" so as to compromise her safe survival in the near future. Accordingly, we reverse.

Reversed.