Submitted October 5, 2018, reversed January 21, 2021

In the Matter of E. J. J.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

E. J. J.,
*Appellant.*

Marion County Circuit Court
17CC01358; A164507

479 P3d 1073

Appellant seeks reversal of an order committing him to the custody of the Oregon Health Authority. He argues that the evidence was insufficient to support the trial court's findings that, due to a mental disorder, he was a danger to others and was unable to provide for his basic personal needs. The state contends that defendant's behavior in two separate incidents and his inability to care for himself supported the court's findings. *Held*: The trial court erred because the state did not establish a lawful basis for civil commitment. The record was insufficient to support a finding by clear and convincing evidence that, due to a mental disorder, appellant was a danger to others, because it relied on evidence that failed to establish a connection to appellant's mental disorder or that could not support a finding that actual future violence was highly likely. As to appellant's ability to provide for his basic needs, the record reflected that, contrary to the state's contention, appellant had both housing and the means to obtain the food necessary for his safe survival.

Reversed.

Rafael A Caso, Judge pro tempore.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jeff J. Payne, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.

DeHOOG, P. J.

Reversed.

**DeHOOG, P. J.**

Appellant seeks reversal of an order committing him to the custody of the Oregon Health Authority for a period not to exceed 180 days. He argues that the evidence was insufficient to support the trial court's findings that, due to a mental disorder, he was a danger to others and was unable to provide for his basic personal needs. *See* ORS 426.130; ORS 426.005(1)(f)(A) and (B).[1] For the reasons set forth below, we agree with appellant and, accordingly, reverse.

When reviewing a civil commitment, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. A.*, 276 Or App 624, 625, 371 P3d 495 (2016) (standard for non-*de novo* review) (internal quotation marks omitted); *see also State v. J. G.*, 302 Or App 97, 98, 458 P3d 721 (2020) ("Our task is to determine whether the record, so viewed, is sufficient to meet the legal standard for involuntary commitment."). We state the facts in accordance with that standard.

Appellant was diagnosed with schizophrenia in 2000, but that diagnosis was later modified to schizoaffective disorder, bipolar type. Since his initial diagnosis, appellant has had a history of hospitalizations and civil commitments due to mental illness. Following a commitment or hospitalization, appellant generally does well for a year or two until for some reason he stops taking his prescribed medications, which leads to his decompensation. Appellant's most recent commitment ended in October 2013, at which time he was prescribed an oral medication, Zyprexa, and an injectable medication, Invega Sustenna. Appellant stopped taking Zyprexa in 2015, but he continued on Invega Sustenna until October 2016.

In February 2017, appellant's mother and stepfather filed a Notification of Mental Illness regarding

---

[1] ORS 426.130 and ORS 426.005 have been amended since the events giving rise to this case. Because those amendments are immaterial to our analysis, we cite to the current versions of the statutes in this opinion.

appellant after seeing him once again decompensate. At the commitment hearing that followed, appellant's mother testified that appellant had begun to exhibit changes when he stopped taking the Zyprexa in 2015, after which his condition deteriorated over the course of a year and a half, most dramatically beginning in October 2016, when he stopped getting Invega Sustenna injections and "just went right off of the side of that cliff."

According to appellant's mother, this was a familiar pattern that she had seen repeatedly over the last 15 years. She described appellant's initial symptoms as paranoia and delusions. As an example of appellant's delusional thinking, his mother explained that, as appellant's representative payee, she managed his money, including his monthly $850 Social Security payments. But, when appellant stopped taking his medications, he began to pull away from his mother and, as he had done in the past, accused her of stealing his Social Security benefits. She testified that, in October, after appellant had stopped getting his injections, he had gone to the Social Security office and changed the payee designation for his benefits from an account that she managed to a personal account that only he could access.

Sometime thereafter, appellant's mother received notice that he had not paid his internet bill. She also learned that appellant had lost his cell phone and his food stamp card. In order to ensure that appellant had a means of communicating with others, his mother paid his internet bill. She also filled out the necessary paperwork so that appellant could replace his food stamp card, but appellant refused to sign it and never turned it in. During that time, appellant told his mother that he had nothing to eat. Because appellant lived near a Subway sandwich shop, his mother gave him a Subway gift card and would replenish it when its balance ran low. Nonetheless, appellant's mother testified that appellant looked gaunt and pasty and had lost a lot of weight as of the time of the hearing.

When asked whether appellant had ever been physically violent with her, his mother responded, "Not that I can recall, no. There's been episodes where he's spat at me and things like that, and [was] very verbally aggressive, but

not physically." She added, "I have never known [appellant] to be violent. That doesn't mean that he would not be in the future."

Paxton, the property manager at appellant's apartment complex, testified that, in the months leading up to the commitment hearing, appellant's apartment had become "very dirty." Paxton described appellant's living circumstances in some detail:

> "There's a twin-size box spring that [appellant has] propped up against the door; food stuck to the counters; stove and oven [are] really dirty; food everywhere. Items strewn all over the counters and floor; garbage sometimes in the middle of the floor; boxes and dressers shoved up against the closet doors. *** Regulator for the window was taken off, which keeps the window from opening farther because it's a prop open window, *** stains on the carpet, things like that."

Due to the condition of appellant's apartment, Paxton served a notice of lease violation on appellant. The notice gave appellant 14 days to clean up his unit to avoid eviction proceedings, but appellant was unable to meet that timeline. Rather than pursue an eviction, however, Paxton gave appellant an additional 15 days to comply, but again, appellant could not bring his apartment into compliance. Paxton testified that appellant "needs to be able to correct [the condition of the apartment], and in the situation that he's in it's obvious that that's not going to happen."

Paxton also testified that, on multiple occasions, she had observed appellant carrying a sword and a large bowie knife around in public. On two of those occasions, Paxton had called the police because she had been concerned for appellant's welfare. However, Paxton also testified that she had never seen appellant threaten anyone with the weapons or otherwise behave violently.

Budlong, who had been appellant's friend since early high school, well before appellant's symptoms first arose, also testified. Like appellant's mother, Budlong had seen appellant both when he was adhering to his medical regimen and when he was not. In explaining the difference between the two, Budlong explained:

> "[Appellant] is a wonderful, wonderful person; a fantastic friend; true and will do anything for you. He's amazing. But when—as he comes off his medication, that goes away and the person that replaces it is angry and then sad; very aggressive. And *** if you mix anything else with it, alcohol or—specifically alcohol, things get real aggressive real fast."

Budlong said that he had noticed a dramatic change in appellant's behavior starting in December 2016, when appellant's "behavior that had been suspect became full blown, crisis level," where it remained.

In February 2017, appellant showed up at Budlong's workplace, wearing only a light coat and soaking wet from the rain, and told Budlong that he was out of money and that he needed Budlong's help with his computers. Budlong agreed to meet at appellant's apartment that evening. When Budlong arrived, he found appellant outside, trying to persuade a neighbor to share his beer. Appellant became aggressive, which seemed to intimidate the other man, who retreated. Budlong and appellant then entered appellant's apartment. According to Budlong, a "giant mattress" blocked the entrance and had to be lifted out of the way before they could enter the apartment, which Budlong described as "in disarray." Appellant first showed Budlong a two-foot long sword and an ornamented knife that he had recently acquired. Appellant then asked about his computers, and, when Budlong asked what was wrong with them, appellant responded that "the government had infiltrated them all and that they were spying on him through them," and that he wanted Budlong to fix that. Budlong told appellant that the government was not spying on him and that he could not "fix" the computers like appellant wanted. Appellant became "agitated for a minute," telling Budlong that he knew that Budlong worked for the government and that he was keeping track of appellant on the government's behalf, but then, Budlong said, became "unconcerned."

Appellant turned on some music and the two chatted briefly. Appellant asked Budlong if he wanted something to eat, but then said that he only had rice and sugar and went to the kitchen to prepare that. Despite their social

interactions, Budlong described the atmosphere as "really tense" and appellant as "very tense" and "very agitated," which made Budlong "very uncomfortable." When appellant then asked whether Budlong would get some marijuana for him,[2] Budlong agreed, but conditioned that on appellant "answer[ing] two questions to [Budlong's] satisfaction."

Budlong then asked appellant, who was at the opposite end of the apartment at the time, whether "now that he's pushed everyone in his life away and he's so sad he's angry, is he happy?" Appellant's response "didn't make any sense" and, because he "didn't get a response," Budlong asked again, "Since you've pushed everyone else, everyone in your life away, are you happy?" At that point, appellant, who by then had moved towards the kitchen island about halfway across the apartment and was "very agitated," told Budlong that he was never his friend and picked up the knife, which he had placed on the island. Satisfied that appellant had sufficiently answered his first question, Budlong asked his second: "If now you're the person that you want to be, and it makes you so unhappy and you're sad, is it worth the feelings that you have and the pain that you cause to be off your medication?"

Upset by that repeated questioning, appellant became very agitated, closed the distance between them, "[bared] his teeth," and "lifted his hand, and along with the knife he made this kind of gesture at [Budlong's] face." Although the record is somewhat unclear, it appears as though appellant may have done that several times, after which "he'd go back and he'd slink back." Budlong described appellant's speech as "unintelligible" and said that appellant's behavior angered and scared him. After appellant turned away, Budlong grabbed him by the shoulder, causing appellant to spin around and yell that Budlong should not touch him and needed to leave. Immediately thereafter—"like a switch"—appellant asked Budlong, "Do you want to go smoke and play videogames afterwards?", to which Budlong responded, "Well yeah. Yeah I do."

_____

[2] Appellant told Budlong at some point that evening that marijuana was the only medication that he was taking. The record does not disclose whether appellant was a designated medical marijuana user at the time.

However, after the two had gone outside together to smoke, Budlong, who had not recovered from appellant's behavior, realized that he did not want to be there any longer and "had to get out." As he was leaving, Budlong tried twice to give appellant a hug, but appellant said "No," and Budlong left. Budlong testified at the hearing that he had felt scared when appellant had the knife and that, when appellant had been in "that state, that [appellant] could have killed" him.

Appellant's former girlfriend, M, also testified at the hearing. M had visited appellant's apartment at around the same time as Budlong. She went there to help him clean the apartment for his upcoming inspection. After the two had been cleaning for a while, appellant "started making sexual advances" by kissing M, but she told him, "Whoa. Slow down. Slow your horses." That happened several times. After each rejection, appellant would briefly refrain from further advances towards M before again attempting to kiss her.

Given how much cleaning they had to do, appellant and M were unable to complete their task the first day. M agreed to spend the night so that they could continue their work the next morning, but she told appellant that she "didn't want any funny business and [that she] wasn't in a place where that was okay." Nonetheless, the next morning, as M lay in bed planning her course of action for the day, appellant woke up, rolled over, and began kissing M and "rubbing up against" her. M told appellant to stop, but he initially persisted, putting a finger in her vagina. M again told appellant "something like 'No. Stop. I don't want this,'" after which appellant responded with "Oh. I didn't realize," and rolled back over. M testified that, although appellant had never before exhibited violence, she did not feel safe continuing any sort of relationship with him "as [things] are right now," in light of that conduct.

In addition to that testimony from appellant's friends and family, the state presented testimony from Dalton, a psychiatric nurse practitioner, who recommended that appellant be civilly committed. Dalton testified that she believed that appellant was unable to care for himself

because "he will not take his medications and *** will continue to be living in the kind of situation where he is now, and possibly even decompensate further." However, Dalton, who had reviewed a prehearing investigative report outlining the foregoing events, opined that appellant did not present a danger to others. Dalton explained that, because appellant had not been violent with others, despite evidence that he had not been on any medication for a period of time, she did not believe that he was a danger to others.

Appellant also testified at the hearing. He acknowledged his diagnosis but said that he did not hear voices and that his schizoaffective disorder diagnosis was likely a result of past drug use. Appellant testified that he had stopped taking his medications because he thought that his long-term use of them was the cause of the stress he had been experiencing. When asked whether he would seek mental health treatment and continue taking his medications if released, appellant said he would "explore" his options, including counseling. He acknowledged his difficulties keeping track of things and finding food, but he said that he would call to get his food stamp card replaced upon his release from the hospital.

At the conclusion of the hearing, the trial court found appellant to be a person with a mental illness and that, because of a mental disorder, appellant was both dangerous to others and unable to provide for his basic needs. As to the dangerous-to-others finding, the court expressly found both M and Budlong to be credible, but focused on appellant's behavior related to weapons. Specifically, the court stated that it found appellant's "continual carrying of weapons to be indicative of someone who will carry with intent to use those weapons." The court further noted that appellant "did use [weapons] against Mr. Budlong and would be facing a felony for his actions." As to appellant's ability to meet his basic needs, the court stated that appellant "has no concept of how to provide food for himself" and that he was "only surviving because his mother fills a Subway card." On those bases, the court civilly committed appellant for a period not to exceed 180 days.

On appeal, appellant does not dispute that he has a mental disorder; rather, he asserts that the evidence is insufficient to support the trial court's determination that his mental disorder rendered him dangerous to others and unable to provide for his basic needs. Appellant observes that there was no testimony that he had actually been physically violent towards anyone or that he had verbally threatened physical violence. Further, he argues that, even if the accounts of his behavior towards M and Budlong were supported by clear and convincing evidence, there was *no* evidence that those events were the result of his mental disorder. As for his ability to provide for his basic needs, appellant observes that, as of the time of the hearing, he had not been evicted from his apartment, he planned to replace his food stamp card, and he had been regularly walking to Subway to buy food with the gift card that his mother had given him. As a result, appellant argues that the evidence did not establish that he "would sustain serious physical harm in the near future from lack of necessary food, water, shelter or medical care."

We turn to whether the evidence supports the trial court's rulings. A court may order that a person be involuntarily committed if, "based upon clear and convincing evidence," the court determines that he or she is "a person with mental illness" and is unwilling or unable to participate in voluntary treatment. ORS 426.130(1).[3] The phrase, "person with mental illness" is defined, in relevant part, in ORS 426.005(1)(f)(A) and (B) as follows:

"(f)   'Person with mental illness' means a person who, because of a mental disorder, is one or more of the following:

"(A)   Dangerous to self or others.

"(B)   Unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm."

---

[3] As we recently explained in *State v. M. J. F.*, 306 Or App 544, 548, 473 P3d 1141 (2020), although ORS 426.130(1)(a) authorizes civil commitment only if, in a trial court's opinion, an individual is "a person with mental illness based upon clear and convincing evidence," that reference to "clear and convincing evidence" states the applicable standard of proof rather than "a description of the credibility or believability of the evidence" produced to satisfy that standard.

We first consider whether the record supports the trial court's determination that appellant presented a danger to others. A person is "dangerous to others" for purposes of ORS 426.005(1)(f)(A) if his "mental disorder makes [him] highly likely to engage in future violence toward others, absent commitment." *State v. S. E. R.*, 297 Or App 121, 122, 441 P3d 254 (2019). That determination is based on the person's "condition at the time of the hearing as understood in the context of his history." *State v. J. K.*, 177 Or App 373, 377, 34 P3d 739 (2001). Further, conclusions about appellant's dangerousness based on conjecture are not enough; "[a]ctual future violence must be highly likely." *State v. T. M.*, 296 Or App 703, 709, 437 P3d 1197 (2019) (internal quotation marks omitted). "[E]vidence of past violent acts must provide a foundation to predict future dangerousness, not merely describe past isolated incidents." *State v. L. R.*, 283 Or App 618, 625, 391 P3d 880 (2017).

In determining that appellant was dangerous to others, the trial court appears to have relied primarily on the incidents with appellant's ex-girlfriend and Budlong, combined with appellant's "continual carrying of weapons." The state acknowledges that mere verbal threats are insufficient to establish dangerousness to others. However, quoting *State v. Bodell*, 120 Or App 548, 550, 853 P2d 841 (1993), the state argues that "'[s]pecific acts of violence are not required to establish that appellant is dangerous, as long as there is ample evidence to form a foundation for predicting future violent behavior.'" (Internal quotation marks omitted.) The state contends that the evidence is sufficient here in that "appellant threatened Budlong with a knife and sexually assaulted [M]." Although we agree as a general matter that dangerousness to others may be established without evidence of specific acts of violence, we conclude that, in the context of appellant's history, the evidence here was insufficient to establish that actual future violence was highly likely. *See T. M.*, 296 Or App at 709 (applying that standard).

We start by addressing the incident involving M. In order to commit someone based upon dangerousness to self or others, "there must be a causal connection between [the person's] alleged mental disorder and [his] allegedly dangerous behavior." *State v. D. A. H.*, 241 Or App 391, 397, 250 P3d

423 (2011). That is, "[a]s the governing statute makes clear, a person must be more than mentally ill in order to be committed involuntarily—the person must also be dangerous to self or others *as a result of* the person's mental illness." *State v. Webber*, 181 Or App 229, 236, 45 P3d 1046 (2002) (emphasis in original); *see* ORS 426.005(1)(f)(A) ("'Person with mental illness' means a person who, *because of a mental disorder*, is \* \* \* [d]angerous to self or others." (Emphasis added.)).

> The state argues that

> "the evidence is clear and convincing that appellant's violence against Budlong and [M] are the result of his long-standing schizophrenia. The record establishes that appellant had been stable during the period when he was taking his [medications], but began to deteriorate physically and mentally when he stopped that medication. His physical acts against Budlong and [M] occurred after he stopped taking his medications, and his schizophrenia was no longer under control."

The state's argument that appellant's behavior towards M establishes that he is a danger to others because of his mental disorder is unavailing. The fact that certain incidents occurred after appellant ceased his use of medication does not, in its own right, establish a causal relationship between his mental disorder and those actions. M testified that appellant seemed "withdrawn" when she was cleaning the apartment with him and that she had to tell him "no" multiple times in response to his repeated sexual advances. M further testified that appellant ultimately stopped after she said, "No. Stop. I don't want this," to which appellant replied, "Oh I didn't realize," and stopped. No witnesses, including M, attributed that conduct to paranoia, delusions, or any other aspect of appellant's established mental disorder. Moreover, nothing in the record suggests that appellant has been sexually violent or aggressive during past periods of decompensation so as to lend support to an inference of such a causal connection. Ultimately, the record cannot support a finding that appellant's actions towards M were the result of his mental disorder. Stated differently, even if it is undisputed that appellant was sexually aggressive towards M, while he was off of his prescribed medications, that conduct is not by itself evidence that his underlying mental

disorder caused him to be a danger to others. *See D. A. H.*, 241 Or App at 398 (causal connection not established where there was no testimony linking the appellant's behavior to her mental disorder when it was plausible that her behavior was the product of other circumstances).

Because the record contains no nexus between appellant's schizoaffective disorder and his behavior towards M, we turn to whether appellant's actions towards Budlong were sufficient to establish that he is a danger to others. As previously noted, a person is a danger to others for purposes of civil commitment proceedings when the person's mental disorder makes the person "highly likely to engage in future violence toward others." *S. E. R.*, 297 Or App at 122. "A single act of violence is sufficient to establish danger to others only if it provides that foundation and there is no indication that such violence is an isolated occurrence." *T. M.*, 296 Or App at 710 (internal quotation marks omitted). "[C]urrent threats of violence by someone with a mental disorder who has carried out an overt violent act in the past against another person are typically sufficient to establish dangerousness to others, while mere verbal threats of violence made in the past are generally insufficient to do so." *Id.* (internal quotations marks and alteration omitted); *see also State v. J. G.*, 302 Or App at 100-01 ("A single violent act may be sufficient to establish that a person is dangerous to others, if the circumstances of the act, the person's history, or other contextual evidence allows the court to rely on the act to predict future dangerousness.").

Although we recognize that fact matching in civil commitment cases is "often of little utility because every involuntary mental commitment case must be decided on its individual facts under the applicable standards," *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011) (internal quotation marks omitted); *see also M. J. F.*, 306 Or App 544, 547, 473 P3d 1141 (2020) (recognizing same, but drawing principles from case law addressing similar facts), we note that we considered rather similar circumstances in *T. M.* In *T. M.*, the appellant suffered from bipolar disorder with psychotic features and had been off of her medications when she angrily raised a fire poker over her head and advanced towards her ex-husband as she threatened to kill him.

296 Or App at 705. In light of the isolated nature of that incident, we held that the evidence was insufficient to establish that the appellant was dangerous to others. *Id.* Although, in that case, the evidence showed that the appellant had gone off of her medications multiple times over the course of 20 years, there was no evidence that the appellant had exhibited other instances of violent or threatening behavior on any of those other occasions. *Id.* at 711.

In this case, we similarly agree with appellant that his behavior towards Budlong is insufficient to support the trial court's determination that his mental disorder renders him dangerous to others. As discussed above, when appellant was off of his medications in February, he frightened Budlong when he became very agitated, picked up a knife, approached Budlong with bared teeth, raised the knife, and gestured at Budlong's face while uttering "unintelligible" words. Although we cannot attach much significance to the uttering of words that cannot be understood, both Budlong and the trial court could reasonably have perceived appellant's conduct as threatening violence. Further, appellant does not dispute that his behavior was causally related to his mental disorder. However, that conduct is insufficient to establish that appellant is highly likely to engage in future violence towards others.

To determine whether that conduct is probative of appellant's future dangerousness, we consider the conduct itself and the circumstances under which it occurred, all as viewed in light of appellant's personal history and other contextual clues. *See J. G.*, 302 Or App at 100-01. Here, although appellant raised a knife in apparent anger at Budlong, it was in the context of an essentially social encounter in which appellant threatened Budlong in response to Budlong provoking him with intentionally pointed questions about appellant's mental disorder, his lack of support from friends and family, and his resulting profound unhappiness. However well-intended Budlong's questioning may have been, it is neither surprising that his questions would trigger an angry response from appellant, nor indicative that appellant is likely to act out violently under foreseeable future circumstances. Moreover, appellant was not shown to have been violent towards others in the past, whether

at times when he was off of his medications or otherwise. And, as noted by the trial court, although Paxton testified that she had seen appellant walking around in public carrying a sword and bowie knife on multiple occasions, she had never seen appellant threaten anyone or otherwise act violently, with or without those weapons. Given that appellant's behavior towards Budlong was an isolated occurrence under unique circumstances, the evidence of that incident was insufficient to establish that, due to appellant's mental disorder, "actual future violence" was "highly likely." *T. M.*, 296 Or App at 709 (internal quotation marks omitted). Accordingly, that evidence could not support the trial court's finding that appellant represented a danger to others.

We turn to the trial court's second basis for its determination that appellant is a person with mental illness, namely, that, due to his schizoaffective disorder, he was unable to provide for his basic personal needs. We recently construed the basic-needs provision, ORS 426.005(1)(f)(B), in *State v. M. A. E.*, 299 Or App 231, 240, 448 P3d 656 (2019), and explained that

> "a person meets the 'basic needs' definition of a '[p]erson with mental illness' under ORS 426.005(1)(f)(B) if the person is unable to provide for his or her basic personal needs in a way that leaves the person at a nonspeculative risk of 'serious physical harm'—meaning that the person's safe survival will be compromised—in the near future, even though that risk is not imminent."

(Brackets in *M. A. E.*) Further, we said that the "risk of serious physical harm need not be *immediate* to justify involuntary commitment, so long as the person's mental disorder, and resulting lack of ability to provide for basic needs, puts the person at risk of such harm in the near future." *Id.* (emphasis in original).

The state argues that appellant's mental disorder led him to be unable to provide his own food, manage his money, take care of his basic hygiene, or make a coherent plan for meeting those needs. Thus, the state reasons, the evidence shows that appellant is unable to provide for his basic needs so as to avoid serious physical harm in the near future. We disagree. To support its argument, the state

emphasizes evidence that appellant would spend his entire Social Security check in the first two weeks of the month, leaving him no money for food or other necessities, and that he lost his food stamp card and refused to do what was necessary to replace it. However, the evidence also showed that appellant was aware that he needed to replace the card and intended to do so upon his release from the hospital. Relatedly, even though appellant often depleted his own resources for obtaining food, he was aware of the necessity of eating and would turn to his mother when necessary to meet that need. That is, the evidence showed that appellant knew to seek out help when he needed it. And, given that appellant's mother regularly replenished his Subway card and gave no indication that she would stop doing so, the record is insufficient to establish by clear and convincing evidence that appellant would suffer a nonspeculative risk of serious physical harm if he were to be released. *Cf. M. A. E.*, 299 Or App at 241-42 (evidence was sufficient to support a basic-needs commitment where it showed that, within one week after her release from the hospital, appellant would be unable to obtain food even if she wanted to eat).

Finally, the state notes Paxton's testimony that it was "obvious" that, in his current condition, appellant would not be able to remedy his apartment situation. Yet, as the state acknowledges, appellant had not been evicted at the time of the hearing notwithstanding those concerns. Moreover, even if eviction proceedings had been ongoing at that time, we have repeatedly stated that homelessness "is not a *per se* basis for a basic-needs commitment." *State v. C. M. C.*, 301 Or App 206, 214, 454 P3d 30 (2019) ("Certain general risks are inherent to houselessness, but in the absence of more specific evidence, this record is insufficient for the trial court to conclude that the lack of housing would place appellant at nonspeculative risk of serious physical harm in the near future."). Thus, whether or not appellant's housing circumstances are tenuous, they cannot support the necessary finding that defendant is unable to meet his basic needs.

In sum, there is no dispute that appellant suffers from a mental disorder. Furthermore, it is undisputed that

appellant engaged in concerning or even criminal behavior in regard to his friend and ex-girlfriend, that he was struggling to obtain food on his own, and that he faced potential eviction. However, no evidence in the record linked appellant's mental disorder to his behavior towards M and, even assuming that appellant's behavior towards Budlong was the product of his mental disorder, the isolated character of that conduct and the unique circumstances that surrounded it preclude a finding by clear and convincing evidence that actual future violence was highly likely, as ORS 426.005 (1)(f)(A) requires. Finally, the evidence showed that, at the time of the hearing, appellant had both housing and the means to obtain the food necessary for his safe survival. Under those circumstances, the state failed to establish, by clear and convincing evidence, a lawful basis for civil commitment. As a result, the trial court erred in concluding otherwise.

Reversed.