Submitted October 30, 2019, affirmed August 18, 2021

In the Matter of C. V.-I.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

C. V.-I.,
aka C. A. V.-I.,
*Appellant.*

Marion County Circuit Court
18CC00137; A168502

496 P3d 5

In this civil commitment appeal, appellant contests the trial court's order continuing her commitment to the Oregon Health Authority for a period not to exceed 180 days. On appeal, appellant argues the evidence was insufficient to support the court's finding that, due to a mental disorder, she was unable to provide for her basic personal needs. Specifically, she contends that any reference by the state to a risk of serious harm arising from her dental condition was speculative and that there was no evidence in the record that supported a finding that she would otherwise be incapable of providing for her own care. *Held*: Although the risk of serious harm purportedly arising from appellant's dental condition was speculative, the record readily supported a conclusion that appellant's history of refusing prescribed medications when unsupervised and abusing methamphetamine presented a nonspeculative risk of serious physical harm. Therefore, the record was sufficient to establish, by clear and convincing evidence, that appellant was unable to meet her basic personal needs.

Affirmed.

Philip L. Nelson, Senior Judge.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jonathan N. Schildt, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and Mooney, Judge, and Kistler, Senior Judge.

DeHOOG, P. J.

Affirmed.

**DeHOOG, P. J.**

Appellant appeals an order continuing her commitment to the custody of the Oregon Health Authority for a period not to exceed 180 days. Appellant contends that the trial court erred in ruling that she was a person with a mental illness. Specifically, appellant argues that the evidence was insufficient to support the court's finding that, due to a mental disorder, she was unable to provide for her basic personal needs. *See* ORS 426.130; ORS 426.005(1)(f)(B). For the reasons that follow, we affirm.

"When reviewing a civil commitment, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. E. J. J.*, 308 Or App 603, 604, 479 P3d 1073 (2021) (standard for non-*de novo* review) (internal quotation marks omitted); *see also State v. M. C. D.*, 304 Or App 775, 780-81, 467 P3d 84 (2020) ("Whether the evidence is legally sufficient to support the court's determination and continued commitment is a question of law."). In this case, the record consists of testimony from Dr. Pointon, appellant's attending psychiatrist at the Oregon State Hospital (OSH), and appellant herself.

Appellant was the subject of a recommitment hearing on July 10, 2018. At the time of the hearing, appellant was 31 years old and had been originally committed to OSH on January 19, 2018, after she had exhibited assaultive behavior towards family members. Pointon became appellant's psychiatrist in March 2018, during appellant's initial commitment to OSH. In examining her medical history, Pointon noted that appellant had a history of psychiatric hospitalizations, methamphetamine use, marijuana use, and possible brain injury. Pointon's opinion was that appellant had a "more severe disorganized type" of schizophrenia. Pointon testified that appellant often exhibits disorganized speech or "word salad"; that is, "when [appellant] starts talking for more than just a few minutes, *** the words are so jumbled up, you're really not sure what she's talking about." Appellant's methamphetamine and marijuana use

makes her more psychotic, and each time she has a psychotic event, she "loses some of her function."

According to Pointon, appellant had been difficult to treat while at OSH. Due to the severity of appellant's mental illness, she was prescribed clozapine, but her medications had to be changed after clozapine caused her severe side effects that ultimately placed her in the ICU. Thereafter, appellant's medication was switched to Prolixin, which appeared to "have a calming effect" on her and was less likely to have the medical side effects associated with clozapine. Pointon acknowledged that appellant's symptoms had improved somewhat in that she was no longer assaultive. However, appellant's psychotic symptoms persisted, and she continued to respond to internal stimuli by talking to people who were not present.

Pointon opined that if appellant were to be released from the hospital she would not be able to provide herself with food or seek appropriate medical care, and she "would be at tremendous risk out in the community for rape, assault, just every possible bad thing that you could think of." Based on the review of appellant's medical records, Pointon testified that appellant had previously been physically and sexually assaulted outside of the hospital as a result of her mental illness. Further, Pointon noted that appellant's thought and speech processes were still so disorganized at the time of the hearing that she did not know if appellant would be able to make her needs understood or otherwise provide for those needs once she was out in the community.

When she was asked whether appellant had any medical issues, Pointon replied:

> "[Appellant is] overweight and we're watching her for diabetes, 'cause [*sic*] unfortunately, all these medicines can cause diabetes, * * * and she has some really bad teeth.
>
> "We've had to remove some of the teeth. And that's another thing, because when teeth become infected, the infection can actually—well, it can kill you if it's untreated.
>
> "Especially if it's in the upper jaw, you can develop abscesses, which can then affect the brain. Again, she has been able to indicate that she's had pain in her teeth. That's

why we've gotten some of the teeth removed, but there's still some that need to be removed or to be treated."

Pointon agreed with appellant's trial counsel that appellant was "medically stable except for [her] teeth." However, even though Pointon acknowledged that "you can never predict" how long it would take for an abscess to develop, she emphasized that abscesses "can flare up so quickly" and the infected areas can drain into the brain.

Additionally, Pointon believed that appellant would not take her medications outside of a supervised setting, particularly in light of appellant's methamphetamine addiction and her history of noncompliance and resulting decompensation. Although Pointon recognized that, if appellant were to be released, it would take "probably a couple of months before she got into real trouble," that timeline would be shortened and the consequences of not taking her medication would be more severe if appellant resumed her methamphetamine use, which the doctor viewed as likely. Appellant had been using methamphetamine since she was a teenager, and she had acknowledged using drugs regularly prior to her admission to OSH. And if she were to reengage in methamphetamine use, Pointon opined, appellant's decompensation would accelerate because "her brain [was] already very delicate" and had already suffered considerable damage due to her methamphetamine use and failure to take her medications. As the doctor explained, "schizophrenia [is] a progressive disease." According to Pointon, "[t]he most [the] medicines can do is kind of halt it." That is, that medication would "maintain" appellant's current brain function, but additional brain damage could result if appellant discontinued her medication and began using methamphetamine again.

Pointon testified that appellant's mother would pick her up from the hospital, as she was very involved with appellant, but, for reasons the doctor was unable to disclose on the record, her mother's care was not a "good setting" for appellant to return to; in fact, it would not be possible. Appellant, on the other hand, testified that she wanted to stay with her parents for a few weeks upon her release from the hospital; she also said that she would continue taking

her medications at a clinic in West Salem. Despite her admission to regular drug use prior to her hospitalization, appellant assured the court that she would not resume her use upon being released.

The trial court concluded that appellant has a mental disorder (schizophrenia) and that she was unable to provide for her basic needs as a result of that disorder. The court therefore continued appellant's commitment. In articulating its basis for continuing appellant's commitment, the court referenced appellant's history of not taking her medications when left unsupervised, her history of substance abuse, and her inability to care for herself when using drugs. Additionally, the court noted Pointon's testimony that living with her mother was not an option for appellant. The court found that not only would appellant not have a place to live, but she also would not have meals or the ability to take care of her medical needs, referring specifically to her "dental issue."

On appeal, appellant does not dispute that she has a mental disorder; she only contends that the evidence did not support the trial court's finding that she was unable to provide for her basic personal needs as a result. In support of her argument, appellant observes that she was able to effectively communicate her plan to stay with her parents once she was released and explain her plan to continue taking her medications, even identifying the clinic where she would get them. Appellant emphasizes Pointon's acknowledgement that appellant was medically stable "except for [her] teeth." And as to her dental health, appellant argues that any risk from an abscess was speculative because there was no evidence that appellant currently had any abscessed teeth and that, even if she did, she already was on a waitlist to have her teeth examined. Finally, appellant argues that there was no indication that she was incapable of obtaining food and that any concern that she would suffer serious physical harm from an inability to obtain food or water was also speculative.

In response, the state contends that the following evidence demonstrates that, at the time of the hearing,

appellant was unable to provide for her basic personal needs due to her mental illness:

> "(1) appellant was largely unable to communicate her needs when medicated and would become 'totally unintelligible' when not medicated; (2) if not hospitalized, appellant would almost certainly discontinue medication and would likely return to using methamphetamine; (3) appellant did not have a safe or certain place to live and, at best, might be able to live with her mother for a few weeks; and (4) if not hospitalized, appellant would be unable to provide herself with food, obtain the medical care needed to prevent infection of her teeth and further damage to her brain, or find safe housing or a safe caregiver that could help protect appellant from assault."

We turn to those arguments.

A trial court may continue a person's involuntary commitment if the court determines that "the individual is still a person with mental illness by clear and convincing evidence and is in need of further treatment." ORS 426.307(6). As relevant to this appeal, ORS 426.005(1)(f)(B) defines a "[p]erson with mental illness" as "a person who, because of a mental disorder, is * * * [u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm."

In order to involuntarily commit a person under the basic-needs theory, the state must prove that the person "is unable to provide for his or her basic personal needs in a way that leaves the person at a nonspeculative risk of 'serious physical harm'—meaning that the person's safe survival will be compromised—in the near future[.]" *State v. M. A. E.*, 299 Or App 231, 240, 448 P3d 656 (2019).

We begin our analysis with what the court described as appellant's "dental issue." We have explained that, to warrant a commitment on the basis that a person cannot provide for the person's own basic needs, the state must present more than a vague estimate of the person's rate of decline following release. *State v. C. M. C.*, 301 Or App 206, 212-13, 454 P3d 30 (2019). That is, "the evidence must establish not only that a person's inability to attend to a basic need risks

the person suffering an adverse medical consequence, but also *how soon* that adverse consequence is likely to occur." *State v. R. L. M.*, 309 Or App 545, 550, 482 P3d 201 (2021) (emphasis in original).

Here, the state argues, the risk presented by appellant's dental issues satisfies that requirement. According to the state, if appellant were to be released, she would be unable to obtain the medical care needed to prevent infection of her teeth, which, as Pointon testified, could result in an abscess. We are unpersuaded that the risk identified by Pointon provides a nonspeculative basis for the trial court to conclude that appellant's safe survival would be placed at risk upon release. Appellant had no known abscessed teeth at the time of the hearing. And, when asked how long it would take for an abscess to develop, Pointon responded, "[y]ou can never predict that" and "it depends on where they are." True, the doctor testified that they can "flare up so quickly" and, in some circumstances, have the potential to affect the brain, leading to death. However, in the absence of any evidence that appellant had an existing infection or was otherwise likely to develop a condition with the potential to result in her death (or other serious physical harm) in the near future, the evidence of her dental condition is insufficient to support her recommitment. *See R. L. M.*, 309 Or App at 553 (reversing commitment, where doctor testified that risk of death to appellant was too "unpredictable" to say if it was imminent).

Turning to appellant's lack of a home to go to, we first note that being without a home cannot, on its own, support a basic-needs commitment. *State v. N. S.*, 306 Or App 140, 147, 472 P3d 818 (2020). Here, however, the concern was not solely that appellant did not have a home to go to, as the trial court found.[1] Rather, the court found that, if appellant did not have housing upon release, she would be unable to care for her medical needs. And, although the medical needs that the court expressly identified included appellant's

---

[1] Although appellant expressed her desire to live with her parents for at least a short time, Pointon testified that that arrangement was not feasible. Appellant provided no other evidence of where she might go if she were not permitted to stay with her mother. As a result, the record supports the trial court's conclusion that appellant had nowhere to live upon release from the hospital.

"dental issue," which we have just concluded did not support appellant's continued commitment, that was not the court's only concern. The court also concluded that appellant would not "take her medications that have been prescribed that seem to \*\*\* be helping her somewhat," and that she would "go back to drug use." And because appellant had a history of not taking her prescribed medications, together with a history of substance abuse, the court concluded that the evidence was sufficient to establish that appellant was unable to provide for her basic needs. For the reasons that follow, we agree.

Although the evidence surrounding appellant's risk of an abscess was speculative, the evidence showing appellant's long history of refusing to take medications and abusing methamphetamine was not. Appellant admitted to using methamphetamine regularly before she was hospitalized, and she did not dispute her tendency to discontinue her use of prescribed medications as Pointon described. From that evidence, the trial court could infer that appellant would again discontinue taking her medications if released, resulting in serious risk to her health. *See State v. L. M.*, 299 Or App 710, 714, 450 P3d 548 (2019) (stating that trial court "certainly could infer from [that] record that appellant would not take medications if released from the hospital"). In *L. M.*, we reversed the appellant's commitment, concluding that, although the evidence suggested that the appellant would not continue to take his medications upon release and that he would resist medical treatment if he were physically injured, there was no evidence to suggest that the appellant would "sustain any type of physical injury in the near future." *Id.* In this case, on the other hand, Pointon testified that appellant's brain was already "very delicate" as a result of her prior drug use and her past failures to take her medications. Moreover, methamphetamine use itself makes appellant more psychotic, and each time appellant has a psychotic event she loses more brain function. Thus, as Pointon indicated, appellant could suffer additional brain damage if she discontinued her medication, began using methamphetamine again, or, as seemed likely, both. Given that evidence, the record here, unlike the record in *L. M.*, shows that appellant faced a nonspeculative risk of serious

physical harm—further damage to her already compromised brain—if she were to be released. As a result, the record is sufficient to establish by clear and convincing evidence that, at the time of the hearing, appellant was unable to meet her basic personal needs that are necessary to "avoid serious physical harm in the near future." ORS 426.005(1)(f)(B). Accordingly, we affirm the order of recommitment.

Affirmed.